SUNFRESH, INC., Plaintiff,

v.

BEAN ACRES, INC., Ronald L. Meyers, First National Bank, and Twenty–First Century Bean Processing Cooperative, Defendants.

No. 99–4154–SAC.

United States District Court, D. Kansas.

Dec. 19, 2001.

Randall J. Forbes, Clinton E. Patty, Friedman, Haynes & Forbes, Topeka, KS, for Plaintiff.

Evelyn Z. Wilson, Thomas E. Wright, Wright, Henson, Somers, Sebelius, Clark & Baker, LLP, Topeka, KS, Ronald S. Shalz, Colby, KS, Michael J. Day, Kite & Day, St. Francis, KS, for Defendants.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This diversity case comes before the court on motions for summary judgment filed by two of the four defendants, First National Bank, ("FNB"), and Twenty–First Century Bean Processing Coopera-

tive ("Twenty–First Century"). This case involves the disappearance of over 10,000[1] hundredweight (hereinafter "cwt"), of pinto beans originally entrusted to defendant Bean Acres, Inc. ("Bean Acres")[2] by the plaintiff, Sunfresh, Inc., for storage. Plaintiff alleges that all defendants are liable for the shortage of beans under theories of joint venture, bailment, and conversion.

## SUMMARY JUDGMENT STANDARD

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the non-moving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348; it requires " 'present[ing] sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.' " *Thomas v. International Business Machines*, 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Industries, Inc. v. Arvin Industries, Inc.*, 939 F.2d 887, 891 (10th Cir.1991)).

The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.*, 45 F.3d 357, 363 (10th Cir.1995).

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265(1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the

---

**1.** Plaintiff first states that 10,173.86 cwt of beans "disappeared," (Dk.154, p. 1), but elsewhere alleges that the amount of missing beans is 10,179.86 cwt (*Id.,* p. 2), and 10,728 cwt. (*Id.,* p. 21). The specific amount is not crucial to the resolution of the issues at this stage of proceeding, however.

**2.** Neither Bean Acres nor Meyers has filed a motion for summary judgment.

evidence, or choose between competing inferences. *Windon Third Oil and Gas Drilling Partnership v. Federal Deposit Ins. Corp.,* 805 F.2d 342, 346 (10th Cir. 1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791(1987).

## FACTS

The parties have provided the court with an abundance of evidence and memoranda which the court has carefully reviewed.[3] The vast majority of the facts set forth by the parties are uncontested, and the dispute is as to the legal effect of such facts.[4] The court will not endeavor to include herein all the uncontested facts established by the parties. Rather, the court will set forth in this section certain facts summarizing the events which transpired, and will include additional facts crucial to resolution of the issues in the analysis which follows.

Plaintiff Sunfresh, Inc. is a Washington corporation involved in raising and marketing various agricultural products. Defendant Bean Acres was a business located in Sharon Springs, Kansas, which purchased dry edible beans from farmers, processed them, and sold them to third parties. Defendant Ronald Meyers was the president of Bean Acres. Defendant FNB is a national bank that loaned money to Bean Acres for the purchase and operation of its business.

In the fall or early winter of 1996–1997, Sunfresh purchased 1995 and 1996 crop pinto beans from Bean Acres and stored them at the Bean Acres facility. Bean Acres issued Sunfresh a federally approved warehouse receipt for the majority of those beans.

Subsequently, due to financial events unrelated to this lawsuit and unrelated to the quantity or quality of the stored beans, Bean Acres' federal warehouse license was suspended by the USDA. Thereafter, Bean Acres and Meyers negotiated an agreement with FNB for the voluntary foreclosure of the bean processing facility and other secured assets. The Foreclosure Agreement between Bean Acres and FNB, dated July 1, 1998, was followed by a sales agreement between Twenty–First Century and FNB, dated July 13, 1998. These two agreements were designed to effect the sale of the facility and other assets from Bean Acres to FNB, which in turn would sell them free of any liens to Twenty–First Century, which would continue the physical operation of the facility.[5]

Between July 1st and July 13th, Bean Acres, through Meyers, continued to operate the facility, with the "consent and approval" of FNB. On or about July 13, 1998, Twenty–First Century took over the facility and its operations, and Meyers became the plant manager for Twenty–First Century. In mid-July, Meyers told plaintiff that plaintiff needed to move all of its beans out of the Bean Acres facility within two weeks because Twenty–First Century had purchased the assets and wanted to start the new bean crop year with an empty, clean facility. On some date not reflected in the record, Twenty–First Century processed, *i.e.,* cleaned and bagged, the beans remaining in storage and FNB paid for such processing.[6]

---

3. The court appreciates the stipulations of fact entered into by the parties, which were particularly helpful in the court's understanding of the pinto bean industry. *See* Dk. 141, Stipulated facts.

4. The court finds the parties' references to various sections of the complaint to be most unusual in light of the fact that a pretrial order, which supersedes the pleadings, has been filed. *See Adams v. Reliance Standard*

*Life Ins. Co.,* 225 F.3d 1179, 1182–83 (10th Cir.2000).

5. Twenty–First Century had planned, as early as February of 1998, to buy the Bean Acres facility.

6. Plaintiff repeatedly alleges that Twenty–First Century processed and sold the beans for a profit, citing to its statement of addition-

On July 21, 1998, a USDA warehouse examiner with 21 years' experience measured the inventory of pinto beans at the facility, and found them to be 1% less than the total obligations of the warehouse. This percentage of difference is not unusual, and was no cause for alarm. In mid-July, Bean Acres requested termination of its federal warehouse license. The sales agreement between FNB and Twenty–First Century closed on August 19, 1998. On August 24, 1998, the same USDA warehouse examiner again measured the inventory of pinto beans at the facility. The August examination found the beans to be 28% less than the total obligations of the warehouse (28,228 cwt inventoried, and 38,956 cwt obligated). This percentage of difference is remarkable. Meyers' explanation for this shortage is that it must have been caused by his failure to take into account the shrinkage of the beans for six years at the facility, and/or by some mistake in the inventory calculations of the warehouse examiner in August.

Plaintiff received some beans from Bean Acres at its close out in August of 1998, rejected other beans as being inferior, and recovered approximately $120,000 from Bean Acres' bond. Plaintiff continues to seek $611,562.00, which it contends is the amount it is damaged by having been shorted over 10,000 cwt of pinto beans. Plaintiff generally contends that because of the nature of the relationship between the defendants, they are all liable for the missing beans, relying upon the theories of bailment, joint venture, and conversion.

## ANALYSIS

### I. BAILMENT

■ Defendants seek summary judgment on plaintiff's allegation that FNB and Twenty–First Century are liable under a bailment theory. This theory recognizes that Bean Acres and/or Meyers were actual bailees of the beans, but contends that the "mere act of Twenty–First Century and FNB exercising control over the pinto beans in storage and the subsequent disappearance while they were in control of the Bean Acres facility makes both defendants either substitute bailees or liable third parties to the bailor/plaintiff." (Dk.154, p. 35).

■ The law of the forum state governs the substantive legal issues surrounding plaintiffs' bailment claim. *See Moore v. Subaru of America*, 891 F.2d 1445, 1448 (10th Cir.1989). It is well established under Kansas law that a bailee in a bailment for mutual benefit must use ordinary care and diligence in the safeguarding of the bailor's property, and he is answerable for loss or injury resulting from failure to exercise such ordinary care and diligence. *M. Bruenger & Co., Inc. v. Dodge City Truck Stop, Inc.*, 234 Kan. 682, 675 P.2d 864 (1984). This general principle has been codified as to warehousemen at K.S.A. § 84–7–204, which states:

(1) A warehouseman is liable for damages for loss of or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful man would exercise under like circumstances but unless otherwise

al facts # 27. (Dk. 154, p. 5; *see id.*, p. 28, 30, 38). Fact # 27 relates solely to the qualifications of the USDA examiner, and fails to support the proposition for which it was cited. *See* Dk. 154, p. 16. The court believes that plaintiff may have intended to cite to its fact # 26, which states that Twenty–First Century "made sales of the pinto beans in storage

to the federal government for a profit." (Dk. 154, p. 16.) This fact is controverted. The record cited in support of fact # 26 fails to establish that Twenty–First Century sold the beans to anyone, and merely establishes that FNB agreed to pay Twenty–First Century a certain amount per bag to process the beans. (Townsend depo., ¶ 29–31).

agreed he is not liable for damages which could not have been avoided by the exercise or (sic) such care.

This subsection "establishes a negligence standard of care for warehousemen." Kansas Comment, 1996, to K.S.A. § 84–7–204(1).

Where bailed property is destroyed or damaged while in the exclusive possession and control of the bailee, Kansas law raises a rebuttable presumption that the bailee's negligence or other fault is the cause of the loss, and casts on the bailee the burden of going forward with the evidence that the loss was due to other causes consistent with due care on its part. *See Nolan v. Auto Transporters,* 226 Kan. 176, 597 P.2d 614 (1979); *Farm Bureau Mut. Ins. Co. v. Schmidt,* 201 Kan. 621, 443 P.2d 254 (1968). The presumption of lack of due care on the part of a bailee where the bailment is destroyed or damaged while under his possession or control, is simply an application of the doctrine of res ipsa loquitur to the liability of a bailee. *Schmidt,* 201 Kan. 621, 443 P.2d 254 (1968); *see Butler Mfg. Co. v. Americold Corp.,* 835 F.Supp. 1274 (D.Kan.1993) (applying Kansas law).

Plaintiff relies upon the case of *German Nat. Bank v. Meadowcroft,* 1880 WL 10015, 95 Ill. 124 (1880). That case held that a Bank and a new third party in charge of a warehouse became "substituted bailees" by receiving a grain elevator containing grain stored for others, and their failure to deliver the grain rendered one or the other liable to respond in damages. *Id.* 1880 WL 10015 at *5. The primary teaching of *German Nat. Bank* is that a purchaser of a facility is deemed to be a constructive bailee of goods received, when no specific agreement to the contrary is reached regarding grain or fungible goods in the facility purchased.

Although the Kansas Court of Appeals has made mention of a constructive bailee or bailee by operation of law, *see Hartford Ins. Co. v. Overland Body Tow, Inc.,* 11 Kan.App.2d 373, 377–78, 724 P.2d 687 (1986), the court has found no Kansas case which has applied that theory, and only a few cases from other jurisdictions. *See e.g., Christensen v. Hoover,* 643 P.2d 525, 529 (Colo.1982) (recognizing that where a person comes into lawful possession of the personal property of another, even though there is no formal agreement between the property's owner and its possessor, the possessor will become a constructive bailee when justice so requires); *W.S.A., Inc. v. ACA Corp.,* 1998 WL 635536 (S.D.N.Y. 1998) (same).

## A. Control by FNB

Assuming, *arguendo,* that Kansas courts would apply the substituted bailee theory in a proper case, plaintiff must raise a material question of fact that the beans were destroyed or damaged while under the control of FNB or Twenty–First Century. To show the requisite degree of control by FNB over the beans, plaintiff relies upon the Foreclosure Agreement.

The Bill of Sale and Assignment between Bean Acres and FNB, which is incorporated in the Foreclosure Agreement as Exhibit C thereto, includes among the property owned by Bean Acres and sold to First National Bank, "beans to be processed which represent approximately 46,000 bags," and represents them to be "free from all encumbrances." Dk. 155, App. 4, Exh. C. Additionally, the Foreclosure Agreement itself between Bean Acres and FNB expressly includes "beans to be processed which represent approximately 46,000 bags," [7] (Dk. 155, Exh. B to App. 4) among the "assets which will be trans-

---

**7.** The court refers to the beans for convenience as "46,000 bags of beans," although it

recognizes that the beans were for the most part not yet bagged.

ferred to First National Bank but not transferred to Twenty–First Century." (Dk.155, App.4, Exh. B, p. 4, ¶ 3).[8] These documents raise a genuine issue of material fact whether the beans at issue were sold outright by Bean Acres to FNB. If so, FNB became the owner of the beans by virtue of the language of the Foreclosure Agreement, and the requisite degree of control is shown.

### Mutual Mistake in Foreclosure Agreement

FNB counters by alleging that this is one of those rare instances in which the parties should not be bound by the plain language of the documents. FNB points to uncontradicted testimony that including the beans in the list of Bean Acres' assets was a mutual mistake.

Under Kansas law, a person who signs a written contract is bound by its terms regardless of his or her failure to read and understand its terms. *Rosenbaum v. Texas Energies, Inc.,* 241 Kan. 295, 299, 736 P.2d 888 (1987). *See Vanier v. Ponsoldt,* 251 Kan. 88, Syl. ¶ 1, 833 P.2d 949 (1992). Such a person is so bound, however, only "in the absence of fraud, undue influence or mutual mistake as to [the contract's] contents." *Washington v. Claassen,* 218 Kan. 577, Syl. ¶ 2, 545 P.2d 387 (1976). Thus, the rule that parties are bound by the terms of the contract is inapplicable to the extent there is a mutual mistake as to the contents and meaning of the contract. In such circumstances, either party is at liberty under proper pleadings to prove a mistake, and to have reformation of the contract. *Geiger v. Hansen,* 214 Kan. 83, 519 P.2d 699 (1974).

The essential elements of mutual mistake in a written instrument for which a court of competent jurisdiction may grant appropriate relief are:

that there was an antecedent agreement which the written instrument undertakes to evidence; that a mistake occurred in the drafting of the instrument and not in the antecedent agreement which it undertakes to evidence; and that in the absence of fraud or inequitable conduct on the part of one of the parties, the mistake is mutual. (Citations omitted).

*Northern Pac. Ry. Co. v. U.S.,* 277 F.2d 615 (10th Cir.1960).

If there is mutuality of mistake, either of law or of fact, the party upon whom the burden rests must allege and prove such fact. *Rosenbaum v. Texas Energies, Inc.,* 241 Kan. 295, 736 P.2d 888 (1987), citing *Grant v. Isett,* 81 Kan. 246, 105 P. 1021 (1909). The quality of proof must be by clear and convincing evidence. *Shinn v. Buxton,* 154 F.2d 629, 636 (C.C.A. 1946); *Foster v. Allen,* 159 Kan. 116, 152 P.2d 818 (1944). FNB seeks to discharge this burden by the sworn testimony of all persons involved in the negotiation and drafting of the agreement, *i.e.,* the attorney who drafted the Foreclosure Agreement, the President of FNB who negotiated and signed on behalf of the bank, and Meyers, who negotiated and signed the agreement on behalf of Bean Acres.

Jerry Fairbanks, the attorney for FNB who drafted the Foreclosure Agreement, testified that it was not the intent of Mr. McCants, FNB's President who signed the agreement, to have the 46,000 bags of beans transferred to the bank. (Dk. 141, Fairbanks depo., p. 19.) When asked why Fairbanks included the reference to the beans in the assets to be transferred to the bank but not to be transferred to Twenty–First Century, Fairbanks responded:

"transferred for value to Twenty–First Century." (Dk.155, App.4, Exh. B, p. 4, ¶ 3).

---

8. The Foreclosure Agreement lists numerous assets other than the beans which are to be

My intent was to show that something had to be done with those beans ... I think it was the agreement between Mr. Meyers and Mr. McCants that ... Bean Acres had an ongoing obligation to get those beans shipped and get them to the rightful owners. And the purpose of having Exhibit B was to show exactly that. We also knew that somebody was going to be responsible for processing those beans.

*Id.*, p. 14–15. When asked why Fairbanks, an experienced attorney, would draft the document to say that 46,000 bags were being transferred to the bank, if that was not the intent of the parties, Fairbanks replied, "I just made a mistake." (*Id.*, p. 21).

Fairbanks knew that the 46,000 bags of beans were owned by third parties who had stored them with Bean Acres. (*Id.*, p. 77). Fairbanks testified that McCants' intent was if the beans were long, *i.e.*, if there were more beans in the facility than were owned by third parties, those beans could be sold by Bean Acres free and clear to generate revenues which would flow to the bank. (*Id.*, p. 21, 76–79). Even absent the Foreclosure Agreement, FNB had a preexisting security interest in any "long" beans which would have entitled FNB to any revenue from their sale. (*Id.*, p. 76–79).

FNB President McCants' testimony about the 46,000 bags of beans is consistent with Fairbanks'. McCants testified that the 46,000 bags of beans "were actually owned by customers of Mr. Meyers and [they] actually were a liability of his and not an asset of the company." (Dk. 141, McCants depo., p. 17.) When asked what the purpose was of the language in the Foreclosure Agreement which transferred the beans to FNB, McCants replied:

I don't really think that they were transferred to us as much as they weren't transferred to Twenty–First Century

Alliance. Basically, you might say that they were not to be transferred—we didn't want Twenty–First Century Alliance thinking that they were going to get those beans. They were not part of the deal.

(*Id.*, p. 17).

When McCants was referred to the language in the Foreclosure Agreement which states that the beans are among the assets of Bean Acres which will be transferred to FNB but not to Twenty–First Century, the following colloquy occurred:

A: "It wasn't an asset of Ron Meyers to transfer to us. It wasn't an asset of Bean Acres." (*Id.*, p. 17–18).

Q. Then why was it listed on Exhibit B?

A. I would say that there was—it probably could have been handled better in that we misdescribed the inventory in this contract.

(*Id.*) Thus according to McCants, the beans were not intended to be part of the deal, were erroneously included in the Foreclosure Agreement as part of Bean Acres assets, and remained owned by Bean Acres customers, and not by Bean Acres, FNB, or Twenty–First Century.

Ron Meyers, the principal for Bean Acres, testified to the same effect. Meyers understood that the reference in the Foreclosure Agreement to the 46,000 bags of beans on Exhibit B referred to approximately 4,600,000 pounds of beans, which were the open storage and warehouse receipt obligations. (Dk. 141, Meyers depo. p. 145–46). When asked what the purpose of the agreement was in transferring those beans to the bank, the following discussion ensued:

A. I believe the purpose of that was that all of our warehouse examinations, up to that point, had indicated that they were possibly or probably long beans.

And if indeed we were long beans, that would have entitled the bank to those beans.

Q. So that would be a way that the bank could potentially, if you were long, potentially sell those long beans and get some more money to pay against your debt?

A. Yes.

(*Id.*, p. 146–47). Meyers' understanding is thus no different than McCants' and Fairbanks'.

The testimony of all the individuals involved is that there was an antecedent agreement which the Foreclosure Agreement attempted to convey, namely, that 46,000 bags of beans belonging to Bean Acres' customers remained to be processed and would benefit FNB only to the extent, if any, that the beans were long.

Nonetheless, the court is concerned that the testimony is self-serving, *see Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir.1995) (conclusory, self-serving affidavit insufficient to withstand motion for summary judgment), and that some probative evidence has been shown which may conflict with the evidence presented. *See Lavery v. R–K Leasing*, 19 F.3d 33, 1994 WL 55567, *3 (10th Cir. Feb. 24, 1994) (Table), citing *Larry Harmon Pictures Corp. v. Williams Restaurant Corp.*, 929 F.2d 662, 663 n. 1 (Fed.Cir.)(argument that affidavit was self-serving "insufficient to raise a genuine issue of material fact where there is an absence of probative evidence conflicting with the evidence presented by [affiant]"), *cert. denied*, 502 U.S. 823, 112 S.Ct. 85, 116 L.Ed.2d 58 (1991).

Plaintiff points to evidence in support of its assertion that defendants' claim of mutual mistake is "simply not credible." (Dk.154, p. 32). Such evidence consists of

the following: that Fairbanks, the drafter of the Foreclosure Agreement, is an experienced attorney with over 20 years experience, and has been the primary attorney for FNB since 1984; that FNB President McCants told Fairbanks what to include in the agreement, reviewed it and requested no changes but signed it; that Meyers took the agreement home and reviewed it before he signed it; that all three individuals knew that the 46,000 bags of beans represented virtually all of the beans in storage at the facility, and none of them asked for a change in the agreement's language or alleged that any mistake had been made until after this litigation began.

Although the court does not make credibility determinations in ruling on a motion for summary judgment, *Hirase–Doi v. U.S. West Communications Inc.*, 61 F.3d 777, 785 n. 4 (10th Cir.1995), the court finds that plaintiff has presented sufficient evidence to raise a genuine issue of material fact as to whether the Foreclosure Agreement's provision regarding the 46,-000 bags ·of beans was the result of a mutual mistake.[9] The language of the Foreclosure Agreement may, in fact, show the requisite degree of control by FNB over the beans.

**B. Control by Twenty–First Century**

 To show that Twenty–First Century had control of the beans, plaintiff relies upon the fact that Twenty–First Century processed the beans for sale after it took possession of the facility. It is undisputed, however, that Twenty–First Century did not take have any ownership interest in the beans, as they were specifically excluded from the assets of Bean Acres to be transferred to Twenty–First Century in the Foreclosure Agreement,

---

**9.** Plaintiff has done significantly more than merely allege that the jury may choose to

disbelieve the testimony of mutual mistake.

and were not included in the listed assets of Bean Acres to be transferred to Twenty–First Century in the sales agreement between FNB and Twenty–First Century. *See* Dk. 155, Exh. 5, p. 12–14.

Twenty–First Century exercised come control of the beans for the express purpose of processing them. As the sales agreement between FNB and Twenty–First Century (referred to as "COOP" in the agreement) states:

> The parties acknowledge that Bean Acres has approximately 35,000 bags of beans left to process for its customers. At the time COOP takes possession on July 13, 1998, it shall be responsible for all expenses and be entitled to all proceeds from the operation of the business. FIRST NATIONAL shall pay to COOP the sum of $1.25 per bag for the actual number of bags processed for prior Bean Acres' customers from and after July 13, 1998. This shall be the only renumeration (sic) due from FIRST NATIONAL to COOP. No other fees will be charged, including fees for bean processing or storage.

Dk. 155, Exh. 5, p. 4.

The facts fail to reveal the length of time Twenty–First Century exercised control over the beans by processing them, or what in fact happened to the beans thereafter. Although it is possible Twenty–First Century may not have exercised sufficient control to render it liable under a bailment theory, it is equally possible that it did. To exercise control over the property of another and change its form, such as was done by Twenty–First Century's processing of the beans, without the permission of the owner of such property, presents a dispute on the bailment issue sufficient to mandate submission to the jury.[10]

## II. JOINT VENTURE

■ Defendants seek summary judgment on plaintiff's claim that a joint venture existed between FNB, Twenty–First Century, Bean Acres, and Meyers "to deprive plaintiff the full value of its pinto beans in storage at the Bean Acres facility." (Dk.154, p. 2).

■ "A joint venture is an association between two or more people to carry out a business activity for profit." *Flight Concepts Ltd. Partnership v. Boeing Co.,* 38 F.3d 1152, 1158 (1994) (citing *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.,* 226 Kan. 70, 76, 596 P.2d 816 (1979)); *see Goben v. Barry,* 234 Kan. 721, ¶ 1, 676 P.2d 90 (1984). In *Nature's Share Inc. v. Kutter Products, Inc.,* 752 F.Supp. 371, 383 (D.Kan.1990), this court explained, "simply stated, a joint venture depends upon three elements: joint ownership, joint operation, and express or implied agreement to share in the profits and losses." (citing *Yeager v. Graham,* 150 Kan. 411, 418–19, 94 P.2d 317 (1939)). The party claiming the existence of a joint venture has the burden of proof. *BRB Contractors, Inc. v. Akkerman Equipment, Inc.,* 935 F.Supp. 1156, 1160 (D.Kan.1996).

Plaintiff alleges that an express joint venture agreement is evidenced by the Foreclosure Agreement's transfer of the beans to FNB, FNB's "unexplained forgiveness of over $1,000,000.00 in debt owed

---

10. The court does not determine whether the general rule in Kansas remains that a gratuitous bailee is liable only for gross negligence. *Compare Maddock v. Riggs,* 106 Kan. 808, 190 P. 12 (1920), with *Lipman v. Petersen,* 223 Kan. 483, 485, 575 P.2d 19 (1978) (quoting from 8 Am.Jur.2d, Bailments, § 109, pp. 1007–1008: "that there is an absolute liability for conversion in such cases, without regard to the question of due care or degree of negligence, is now regarded as an established legal principle, applicable to bailments of every description").

by Bean Acres and Meyers," and the provision in the sales agreement between FNB and Twenty–First Century that the latter would process the beans. (Dk.154, p. 25–26). Plaintiff additionally contends that circumstantial evidence shows an implied joint venture agreement. Plaintiff bases this contention on the following alleged facts: the disappearance of the beans only after the "involvement" of FNB and Twenty–First Century; FNB's allowing Meyers to continue to run Bean Acres with its "consent and approval"; FNB's becoming a shareholder in Twenty–First Century and providing it an interest free loan to finance the purchase of Bean Acres; Meyers' status as general manager for Bean Acres and immediately thereafter for Twenty–First Century, and Meyers' inadequate explanation for the disappearance of the beans. (*See* Dk. 154, p. 25.). These facts, viewed in the light most favorable to the plaintiff, coupled with those discussed above in the court's analysis of the bailment issue, convince the court of the possibility that the parties may have been joint venturers.

The court will note only a few of the facts that lead it to this conclusion. It is possible that some joint control of the facility and the beans occurred because Twenty–First Century operated the facility prior to the date the sales agreement between FNB and Twenty–First Century actually closed. Although no sharing of profits or losses has been shown, both FNB and Twenty–First Century benefitted by their agreement to process the beans—Twenty-First Century could begin operations with a clean facility, and FNB could thus facilitate the sale to Twenty–First Century. Further, the fact that FNB became a shareholder in Twenty–

First Century and provided it an interest free loan to finance the purchase of Bean Acres makes it more than a mere detached lender. Additionally, some degree of control over the management and direction of the business enterprise has been shown by undisputed evidence that Meyers continued to run Bean Acres with FNB's "consent and approval" between July 1st and July 13th, then immediately thereafter became the general manager for Twenty–First Century, at a time when the facility was still owned by FNB. Under the totality of the circumstances, the documents and testimony may support a joint venture theory.[11]

## III. AGENCY THEORY

 Plaintiff additionally contends that under the unique circumstances of this case, Meyers was an agent of both FNB and Twenty–First Century, so that if the beans were lost as a result of the wrongful or negligent acts of Meyers, FNB and Twenty–First Century are liable under agency principles. The sole case cited in support of this assertion is *Southwest Nat. Bank of Wichita v. ATG v. Const. Management, Inc.*, 241 Kan. 257, 260–61, 736 P.2d 894 (1987). (Dk.154, p. 36).

The court in *Southwest Nat. Bank of Wichita* at the cited pages discussed only the liability of one engaged in a joint venture for the acts of his associates. The court quoted the following passage from 46 Am.Jur.2d, Joint Ventures § 57, p. 76:

In accordance with the general rule that each member of a joint venture acts as both principal and agent of his coventurers as to those things done within the apparent scope of the venture and for its benefit, it is held that each of several

---

**11.** The court finds it unnecessary to address in this memorandum the apparent conflict between plaintiff's theory that defendants had exclusive control over the beans, for purposes of the bailment theory, but had joint control over the beans, for purposes of the joint venture theory.

joint venturers has power to bind the others and to subject them to liability to third persons in matters which are strictly within the scope of the joint enterprise.

241 Kan. at 260, 736 P.2d 894.

The sole discussion in the cited pages of the *Southwest Nat'l Bank* case of agency is in the context of a joint venture. Here, because the court has found a material question of fact regarding joint venture, plaintiff's agency theory[12] premised upon joint venture survives as well. The court notes, however, that this agency theory is not independent from the joint venture theory, but merely expresses the rationale why joint venturers are liable for each others' acts. Any issues whether the acts were within the scope of the venture and for its benefit remain for the trier of fact.

## IV. CONVERSION

■ Defendants seek summary judgment on plaintiff's claim that FNB and Twenty–First Century are liable for conversion.

■ Under Kansas law, a conversion is "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another." *Nelson v. Hy–Grade Const. & Materials, Inc.*, 215 Kan. 631, 634, 527 P.2d 1059 (1974). *See Carmichael v. Halstead Nursing Center, Ltd.*, 237 Kan. 495, Syl. ¶ 2, 701 P.2d 934 (1985). Plaintiff concedes that the processing of the beans does not alone amount to a conversion, Dk. 154, p. 37, but alleges that "the disappearance of those beans after the involvement of FNB and Twenty–First Century clearly presents a disputed issue over the conversion of the pinto beans" (*Id.*) Based upon facts included in the court's discussion of the issues above, the court finds sufficient evidence

that FNB and Twenty–First Century exercised adverse dominion and control, or exercised the right of ownership, over the beans in storage at Bean Acres to present a material question of fact on the issue of conversion.

IT IS THEREFORE ORDERED that defendants Twenty–First Century and FNB's motions for summary judgment (Dk. 139 & 143) are denied.

---

12. Plaintiff has raised no agency theory independent of its joint venture theory, but cites solely to the joint venture/agency discussion in the *Southwest Nat'l Bank* case in support of its agency claims. *See* Dk. 154, p. 35–36.