Elaine LEONARDO, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 01–641 C.

United States Court of Federal Claims.

Jan. 31, 2005.

---

Gregory F. Wells, Washington, DC, for plaintiff. John H. Shenefield and Stacey C. Burton, Washington, DC, of counsel.

Kyle Chadwick, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Mark A. Melnick, Assistant Director, Civil Division, United States Department of Justice, Washington, DC, for defendant. Kevin M. Gleeson, Department of State, Washington, DC, of counsel.

## OPINION

HEWITT, Judge.

### I. Introduction [1]

This contract case is before the court following trial on the issue of liability. Certain artwork of plaintiff, Elaine Leonardo (Ms. Leonardo or plaintiff), was exhibited at the American Cultural Center (ACC) of the United States Information Service (USIS) in Brussels, Belgium from October 31 to November 27, 1990. Plaintiff's Exhibit (PX) 13 (ACC press release announcing the exhibition). Plaintiff asks the court to find that defendant, the United States (United States, government, or defendant), breached a contract of bailment to store eighty-seven pieces of plaintiff's artwork following that exhibition, Complaint (Compl.) ¶ 35; Plaintiff's Trial Memorandum (Pl.'s Mem.) at 16, when it failed to return the artwork to plaintiff in 1997, Compl. ¶¶ 1, 39–41, 56–57. The artwork was destroyed by a bulldozer during 1996 renovations to the leased facility housing the ACC. *Leonardo v. United States,* 55 Fed.Cl. 344, 346 (2003) (*Leonardo I* ) ("In 1996, the owner of the building in which the [ACC] was located began renovations of the entire building. At the beginning of December, 1996, the side entrance of the building and an adjacent storage room were demolished by a bulldozer. Plaintiff's artwork, which was stored in that storage room, was destroyed." (citations omitted)); Pl.'s Mem. at 14; Compl. ¶¶ 37, 41; *see also Leonardo v. United States,* 60 Fed.Cl. 126, 127 (2004) (*Leonardo II* ) ("In December 1996, the majority of plaintiff's artwork that was stored at the [American Cultural] Center was destroyed when the room in which her art was stored was bulldozed." (citations omitted)). Defendant argues that no bailment contract was ever formed between the parties because the ACC representatives with whom Ms. Leonardo dealt lacked authority to contract, Defendant's Pretrial Memorandum of Contentions of Fact and Law (Def.'s Mem.) at 3–4, or because the alleged bailment agreement was not ratified by a government representative who possessed authority to contract, *see id.* at 5.

Plaintiff is a professional artist. Transcript of Trial (Tr.) at 43:15 (testimony of plaintiff). She testified that the United States government has, since 1973, assisted her from time to time in securing exhibitions at various cultural centers in France, England and Belgium. *See generally id.* at 52:17–23 (testimony of plaintiff that the United States Embassies in Paris and London selected plaintiff's artwork to "represent the United States" in 1991); *id.* at 59:14–65:18 (testimony of plaintiff concerning exhibitions at the ACCs in Amsterdam and Brussels in 1973 and 1974); *id.* at 66:1–75:17 (testimony by plaintiff that between 1974 and 1977 personnel at the Brussels ACC arranged exhibitions of plaintiff's art in several Belgian cities); *id.* at 75:24–78:5 (testimony of plaintiff that Brussels ACC personnel arranged a show in Leuven, Belgium in 1986).

The two government employees with whom plaintiff claims to have entered into a bailment contract are Jan Van Kerkhove who, by 1974, was the assistant to the cultural attaché at the ACC in Brussels, *id.* at 68:5–16 (testimony of plaintiff), and Mary Ann Ignatius, who became the Cultural Affairs Officer at the ACC in Brussels shortly before the 1990 exhibition of plaintiff's work, PX 1 (Officer Evaluation Report for Mary Ann Ignatius dated 6/10/91), at 1, 3 (stating that Ms. Ignatius assumed her duties on September 29, 1990 and describing Ms. Ignatius' "initial eight months as Cultural Affairs Officer in Brussels").

---

1. For additional background, see generally *Leonardo v. United States,* 55 Fed.Cl. 344 (2003) (*Leonardo I* ) (granting plaintiff's cross-motion for partial summary judgment that plaintiff's breach of contract claim fell within this court's jurisdiction; granting defendant's motion for summary judgment that plaintiff's copyright infringement claim, which "ar[ose] in a foreign country," *see* 28 U.S.C. § 1498(c), was outside this court's jurisdiction; and staying defendant's motion for summary judgment as to breach of contract pending discovery on the issue of government officials' authority to contract); *Leonardo v. United States,* 60 Fed.Cl. 126 (2004) (*Leonardo II* ) (denying defendant's motion for summary judgment and plaintiff's cross-motion for summary judgment on the issue of contracting authority, and bifurcating the trial into liability and damages phases).

By 1989, Mr. Van Kerkhove held the title of "Cultural Affairs Specialist," and functioned as an assistant to the Cultural Affairs Officer at the ACC. PX 3 (7/10/89 Position Description Update for Jan Van Kerkhove). Plaintiff testified that her negotiations to place the 1990 exhibit at the ACC began in 1988 when, during a visit to Europe, she called Mr. Van Kerkhove in Belgium. Tr. at 79:3–5 (testimony of plaintiff); *see also id.* at 79:9–15 (colloquy between plaintiff and her counsel). During this conversation, Mr. Van Kerkhove "invited [plaintiff] to ... visit him in Brussels." Id. at 79:6. Plaintiff testified that she brought her portfolio with her and that, during this visit, she received an offer to have her artwork shown at the ACC. See Tr. at 79:20–22, 80:7–21 (testimony of plaintiff). At some point, arrangements were made for plaintiff to have a one-month show at the ACC in November 1990. *See* PX 13 (ACC press release announcing an October 31—November 27, 1990 exhibition of plaintiff's artwork).

Plaintiff traveled to Brussels to prepare for the exhibition on October 11, 1990. PX 107 (Plaintiff's Appointment Calendar), at 1. Plaintiff was not present at the ACC when her exhibition closed on November 27, 1990 and did not participate in taking down the show or storing her artwork. *Id.* at 126:22–127:18. Plaintiff testified that she inspected her artwork during a brief visit to Brussels in 1991. *See id.* at 132:3–23. Plaintiff learned of the loss of her artwork in March of 1997. *Id.* at 179:20–180:1 (testimony of plaintiff).

Plaintiff filed a complaint in this court on November 13, 2001, alleging that "the United States of America's grossly negligent conduct caus[ed] the destruction and loss" of plaintiff's artwork. Compl. at 1. Plaintiff claims that, "[a]s a direct and proximate cause of the United States' breach of contract, [she] has suffered damages ... [of] not less than $2,610,000." *Id.* ¶ 58.

## II. Discussion

Plaintiff stated in her pretrial memorandum that "uncontroverted evidence" presented at trial would "prove the existence of a bailment contract between the United States and Ms. Leonardo ... for the mutual benefit of both parties." Pl.'s Mem. at 16. Plaintiff's counsel argued in summation that "there is a six-year course of performance [2] by the parties that demonstrates that they intended to make this agreement and were performing it until events in 1996 that le[d] to the United States['] failure to return the artwork," Tr. at 280:21–281:1 (statement of plaintiff's counsel), which plaintiff characterizes as a breach of contract, *see* Pl.'s Mem. at 30. Despite the fact that a loss of great importance to plaintiff occurred, the court cannot address the question of liability for the loss until it has determined that a valid bailment contract existed between the parties. Accordingly, the court first turns to the question of contract formation.

### A. Plaintiff's Burden of Proof as to Contract Formation

■ In addition to proving the standard elements of contract formation,[3] parties seeking to enforce a contract against the United States must establish that the government representatives who entered into or ratified the agreements possessed actual authority to bind the government. *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed. Cir.1997); *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990). "[T]he government is not bound by the acts of its agents beyond the scope of their actual authority," *Harbert/Lummus Agrifuels Pro-*

2. Much testimony at trial focused on prior agreements that plaintiff allegedly had made with the ACC to exhibit and store her artwork. *See generally* Tr. at 51:24–78:19, 81:9–85:11. The court notes, however, that course of performance, at least as it refers to prior dealings between parties, is not sufficient to prove whether a specific contract was formed under a ratification theory—the focus of this opinion. *Doe v. United States,* 48 Fed.Cl. 495, 504 (2000) ("'[A] 'plaintiff's prior experience with the [agency] is not

sufficient as proof [of ratification] with respect to the contract at issue.'") (quoting *Henke v. United States,* 43 Fed.Cl. 15, 27 (1999)).

3. "The party alleging a contract must show a mutual intent to contract including an offer, an acceptance, and consideration." *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325, (Fed.Cir.1997) (citing *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990)).

*jects v. United States,* 142 F.3d 1429, 1432 (Fed.Cir.1998), nor can it "be bound by the apparent authority of its agents," *Roy v. United States,* 38 Fed.Cl. 184, 187 (1997) (footnote omitted). Accordingly, parties who enter into agreements with the government "take[ ] the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *Fed. Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947). " '[T]his risk remains ... even when the Government agents themselves may have been unaware of the limitations on their authority.' " *Harbert/Lummus,* 142 F.3d at 1432 (quoting *Trauma Serv. Group,* 104 F.3d at 1325); *see also Fed. Crop Ins.,* 332 U.S. at 384, 68 S.Ct. 1 ("The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation .... And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority."). Further, "[p]arties contracting with the government are ... 'charged with having knowledge of the law governing the formation of such contracts.' " *Arakaki v. United States,* 62 Fed.Cl. 244, 261 (2004) (quoting *Am. Gen. Leasing, Inc. v. United States,* 218 Ct.Cl. 367, 587 F.2d 54, 58 (1978)). They must ascertain the government representative's authority—and the limits of that authority—to form a valid contract with the government. *Harbert/Lummus,* 142 F.3d at 1432.

Accordingly, Ms. Leonardo bears the burden of proving, by a preponderance of the evidence, either that Mr. Van Kerkhove possessed actual authority to contract, or that Ms. Ignatius both possessed authority to contract and ratified Mr. Van Kerkhove's alleged agreement with plaintiff. *See Kania v. United States,* 227 Ct.Cl. 458, 650 F.2d 264, 268 (1981); *Howard v. United States,* 31 Fed.Cl. 297, 312 (1994). Ms. Leonardo "must prove that [these individuals] had actual authority" to contract on behalf of the government; her possible belief that these individuals possessed contracting authority is irrelevant. *Harbert/Lummus,* 142 F.3d at 1432.

When evaluating the evidence presented at trial, the court not only weighs the substance of each party's proof, but also assesses the credibility of the testimony and documentary evidence offered by each party. *See* Rule of the Court of Federal Claims (RCFC) 52(a) ("[D]ue regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."); *Brock v. Roadway Express, Inc.* 481 U.S. 252, 266, 107 S.Ct. 1740, 95 L.Ed.2d 239 (1987) ("Final assessments of the credibility of supporting witnesses are appropriately reserved for the [trial] judge, before whom an opportunity for complete cross-examination of ... witnesses is provided."); *Refac Int'l, Ltd. v. Lotus Dev. Corp.,* 81 F.3d 1576, 1582 (Fed.Cir.1996) ("The [trial] court is best suited to make credibility determinations") (citing Fed. R.Civ.P. 52(a) and *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) ("When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.")); *Bailey v. United States,* 54 Fed.Cl. 459, 461 (2002) ("Demeanor is of the utmost importance in the determination of the credibility of a witness. The innumerable telltale indications which fall from a witness during the course of ... examination are often much more of an indication to [the court] of [the witness's] credibility and the reliability of [the witness's] evidence than is the literal meaning of [the witness's] words.") (quotation and citation omitted).

In this case, defendant chose not to offer any witnesses or exhibits to support its defense. *See* Def.'s Witness List ("[D]efendant ... respectfully states that we do not intend to call any witnesses, except that we reserve the right to call one or more witnesses exclusively for impeachment purposes."); Def.'s Ex. List (listing no defense exhibits, but "respectfully reserv[ing] the right to offer into evidence, during cross-examination, any exhibit identified in plaintiff's exhibit list"); Transcript of 9/23/04 pretrial conference at 41:7–16 (statement of court) (interpreting the phrase, "reserves the right to offer into evidence" in defendant's exhibit list," as "re-

serve[s] the opportunity to use for impeachment purposes any document on the list"). The only evidence presented at trial was plaintiff's testimony and plaintiff's supporting documentary evidence.

### B. Whether Jan Van Kerkhove and Mary Ann Ignatius Possessed Actual Authority to Contract

Actual authority to contract may be express or implied. *H. Landau & Co. v. United States,* 886 F.2d 322, 324 (Fed.Cir. 1989). "Government employees hold express actual authority to bind the government in contract only when the Constitution, a statute, or a regulation grants them such authority in unambiguous terms." *Starflight Boats v. United States,* 48 Fed.Cl. 592, 598 (2001); *see also JGB Enters. v. United States,* 63 Fed.Cl. 319, 331–32 (2004) (same). Government employees hold implied actual authority to bind the government " 'when such authority is considered to be an integral part of the duties assigned to [them].' " *H. Landau,* 886 F.2d at 324 (quoting John Cibinic, Jr. & Ralph C. Nash, Jr., *Formation of Government Contracts* 43 (1982)). "Contracting authority is integral to a government employee's duties when the government employee could not perform his or her assigned tasks without such authority and the relevant agency regulation does not grant such authority to other agency employees." *Flexfab, LLC v. United States,* 62 Fed.Cl. 139, 148 (2004); *see also Roy,* 38 Fed.Cl. at 189 (framing the relevant inquiry as "whether contractually binding authority is necessary or essential to the successful performance of [the government employee's] duties"). Accordingly, an inquiry into the precise nature of the government employee's duties is appropriate to determine whether implied actual authority exists. *See Zoubi v. United States,* 25 Cl.Ct. 581, 587 (1992).

### 1. Jan Van Kerkhove Lacked Express Authority to Contract

Plaintiff argues that "Jan Van Kerkhove had express actual authority" to contract. Pl.'s Mem. at 24. The court disagrees. Plaintiff fails to identify a statute or regulation that unambiguously grants Mr.

Van Kerkhove authority to contract on behalf of the government. *See JGB Enters.,* 63 Fed.Cl. at 331–32; *Flexfab,* 62 Fed.Cl. at 148; *Starflight Boats,* 48 Fed.Cl. at 598. Plaintiff instead points to language in Mr. Van Kerkhove's position description as evidence that Mr. Van Kerkhove was delegated express contracting authority. *See* Pl.'s Mem. at 24 & n. 47 (quoting PX 3 (7/10/89 Position Description Update for Jan Van Kerkhove)). Furthermore, plaintiff concedes that Mr. Van Kerkhove's authority was subject to "his supervisor's approval." *Id.* at 24 (footnote omitted). For the reasons discussed in Part II.B.2 below, the language in Mr. Van Kerkhove's position description on which plaintiff relies supports neither an argument for implied authority to contract nor an argument for express authority to contract.

### 2. Jan Van Kerkhove Lacked Implied Authority to Contract

As to implied authority to contract, plaintiff correctly points out that "[a]ctual authority to bind the United States in contract is generally implied when such authority is considered to be an integral part of the duties assigned to a government employee." Pl.'s Mem. at 27. Plaintiff contends that contracting was an integral part of Mr. Van Kerkhove's duties because "Mr. Van Kerkhove's job required him to engage artists in binding contracts to present their artwork at the ACC. The basic function of his position was to develop and implement cultural programs." Pl.'s Mem. at 28.

As plaintiff notes, for contracting authority to be "integral" to an employee's duties, such authority must be "necessary or essential to ... carrying out [those] assigned duties." *Cruz–Pagan v. United States,* 35 Fed.Cl. 59, 61 (1996), cited in Pl.'s Mem. at 28 & n. 57. In *Cruz–Pagan,* an informant for the Drug Enforcement Administration (DEA) sought to enforce an alleged oral contract under which DEA field agents purportedly agreed to pay that informant twenty-five percent of the value of any property seized or forfeited as a result of his assistance in a drug investigation. *Id.* at 60. This court granted defendant's motion for summary judgment on the grounds that the DEA field agents lacked

implied authority to contract with informants on behalf of the government because, *inter alia,* "the grant of contracting authority [was] not integral to field agents performing their designated duties." *Id.* at 63. The court explained:

> DEA could efficiently create ... an expectation of compensation [by informants] without granting contracting authority to its field agents. For example, DEA could adopt internal procedures that grant contracting authority to supervisors of the field agents and oblige the field agents to secure approval from their supervisors before agreeing to provide compensation for assistance. Alternatively, DEA could establish procedures by which DEA would evaluate the value of the information or service provided, and based on that evaluation grant compensation to informants on a fair and reasonable basis.

*Id.* at 61. Noting that DEA "followed the latter approach," *id.,* the court concluded that

> [i]n this setting, because reasonably efficient alternatives appear to exist to create the desired expectation of compensation, it would not be necessary or essential for DEA to grant contracting authority to its field agents in order to enable the agents to carry out their assigned duties of maintaining contact and exercising control over informants.

*Id.* (footnote omitted).

When the facts of this case are analyzed in light of *Cruz–Pagan,* it is clear that contracting was neither a "necessary," *id.* at 61, nor "integral," *id.* at 63, part of Mr. Van Kerkhove's duties at the ACC. Mr. Van Kerkhove's three most significant "[d]uties and [r]esponsibilities" were "[p]articipat[ing] in planning, preparing and organizing of cultural and informational programs at the American Cultural Center"; "[c]onceiv[ing] and im-

plement[ing] the exhibition program at the ACC and organiz[ing] traveling exhibitions"; and "[h]elp[ing] Belgians with various questions regarding cultural initiatives involving the United States." PX 3 (7/10/89 Position Description Update for Jan Van Kerkhove), at 2. Nothing in this position description implies either that Mr. Van Kerkhove led any ACC programs or that contracting authority was necessary for him to discharge his duties successfully. *Cf. Zoubi,* 25 Cl.Ct. at 587 (finding that the "Acting Program Director" of a program to train Customs personnel possessed implied actual "authority to obtain the personnel necessary for establishing the project") (footnote omitted). The court agrees with defendant that "evidence that ... Mr. Van Kerkhove [was] responsible for ... planning cultural activities is insufficient to prove that [he] possessed implied actual contracting authority." Def.'s Mem. at 4 (emphasis omitted).

Another reason that contracting is not integral to Mr. Van Kerkhove's successful job performance is that a "reasonably efficient alternative[ ]," to vesting him with contracting authority exist[ed]." *Cf. Cruz–Pagan,* 35 Fed.Cl. at 61. Rather than vest Mr. Van Kerkhove with implied contracting authority, the ACC instead granted contracting authority to Mr. Van Kerkhove's supervisor and obliged Mr. Van Kerkhove to secure approval from his supervisor before entering into agreements with artists. Cf. *id.* at 61.

Mr. Van Kerkhove's official Position Description provides:

> *Authority to make Commitments* [4]: Clearance by the supervisor is required in all instances.

PX 3 (7/10/89 Position Description Update for Jan Van Kerkhove), at 3. Other passages in Mr. Van Kerkhove's position description confirm that his work was overseen by the

---

**4.** The court agrees with plaintiff that the term "commitments" in Mr. Van Kerkhove's job description is synonymous with the term "contracts." *See Am. Heritage Dictionary of the English Language* 372 (4th ed.2000) (defining "commitment" as "[a] pledge to do" or "[s]omething pledged, especially an engagement by contract involving financial obligation"); *Black's Law Dictionary* 288 (8th ed.2004) (defining "commitment" as "[a]n agreement to do some-

thing in the future, esp[ecially] to assume a financial obligation"); *cf. Harbert/Lummus,* 142 F.3d at 1432 ("The C[ontracting] O[fficer]'s authority to commit and bind ... contractually was specifically conditioned in his delegation of authority."); *Home Fed. Bank of Tenn. v. United States,* 57 Fed.Cl. 676, 686 (2003) ("[P]laintiff has the affirmative burden of showing that the Government official, on whose conduct he relied, had the authority to commit the Government.").

Cultural Affairs Officer. *See, e.g.,* PX 3 at 2 (*"Basic Function of Position:* Under the general supervision of the Cultural Affairs Officer and as [her] principal advisor on cultural matters in Belgium ...."); *id.* at 3 ("Although the incumbent should rely on his/her own judgment in many instances, the various steps in the organization of a program are discussed with the supervisor.").

These provisions make clear that independent authority to contract was neither contemplated by the ACC nor necessary or integral to Mr. Van Kerkhove's duties. Rather, Mr. Van Kerkhove was permitted to enter into commitments only with the approval of his supervisor, the Cultural Affairs Officer. Plaintiff concedes this point in briefing, but attempts to diminish its importance. *See* Pl.'s Mem. at 24 ("Jan Van Kerkhove's Position Description confirms the express authority delegated to him to enter into the type of contract at issue, subject only to obtaining his supervisor's approval."); *cf.* Def.'s Mem. at 4 (noting that "Ms. Ignatius['s] ... contracting authority, if any, ... *must ultimately* have been invoked" for the government to be bound). In light of the nature of Mr. Van Kerkhove's duties and the plain meaning of the text of his job description, the court concludes that Mr. Van Kerkhove lacked actual authority to obligate the United States contractually unless his supervisor approved or ratified the contract. *See Leonardo II*, 60 Fed.Cl. at 131 ("In the absence of Ms. Ignatius' approval, Mr. Van Kerkhove could not have had actual authority to bind the government.") (footnote omitted).

### 3. Mary Ann Ignatius Possessed Implied Authority to Contract

For Mr. Van Kerkhove to bind the government contractually, he not only needed to secure the approval of his supervisor; his supervisor also must have been vested with authority to contract. *See Trauma Serv. Group,* 104 F.3d at 1325 ("A contract with the United States ... requires that the Government representative who entered or ratified the agreement had actual authority to bind the United States."). Accordingly, the court now explores whether Ms. Ignatius possessed this requisite authority.

Plaintiff contends that "Mary Ann Ignatius had implied actual authority by virtue of [her] ... position[ ] as ... Cultural Affairs Officer at the ACC," Pl.'s Mem. at 27, and argues that "Ms. Ignatius' primary function—to oversee cultural programs at the ACC—required the power to contract." *Id.* at 28. According to plaintiff, Ms. Ignatius could not have carried out her job requirement of " '[p]lan[ning], coordinat[ing] and carry[ing] out cultural programs in support of diplomacy objectives identified in the Country Plan,' " *id.* at 28 & n. 60 (quoting PX 1 (Officer Evaluation Report for Mary Ann Ignatius dated 6/10/91), at 1), unless she possessed, "at a minimum, the authority to enter into contracts with artists to participate in such programs." *Id.* at 29. Defendant argues that contracting authority was not necessary for Ms. Ignatius to discharge her duties. Def.'s Mem. at 4 ("[E]vidence that Ms. Ignatius ... [was] responsible for managing the ACC ... is insufficient to prove that [she] ... possessed implied actual contracting authority .... [I]t cannot be said that, as a matter of law, the Cultural Affair's Officer's ... power to manage necessarily includes the power to contract.") (quotations, citation and emphasis omitted); Tr. at 293:11–16 ("It's not necessary at all for [Ms. Ignatius] to enter into contracts with American citizens, enforceable contracts[,] to carry out [her] work. [Ms. Ignatius was] there to help, and [she] did help.") (closing argument of defendant's counsel).

Ms. Ignatius' 1991 Officer Evaluation Report, see generally PX 1, lists "in priority order ... the general work requirements directed at meeting post/area/office objectives and mission of [the United States Information Agency]." *Id.* at 1. The first two priorities read as follows:

1. Plan, coordinate and carry out cultural programs in support of public diplomacy objectives identified in the Country Plan.

2. Manage the activities of the Cultural Center and library so as to create a positive image of the United States, and to encourage use of these facilities by elements of all three U.S. Missions

in Belgium. Ensure focus and effectiveness of cultural programs . . . .

*Id.* In contrast to the DEA field agents in *Cruz–Pagan,* who reported to field supervisors, and in contrast to Mr. Van Kerkhove, who reported to the senior person in his department, Ms. Ignatius oversaw all programs and activities at the ACC and "report[ed] directly to the Country Public Affairs Officer." PX 1, at 1. The court sees no "reasonably efficient alternative," *Cruz–Pagan,* 35 Fed.Cl. at 61, to vesting Ms. Ignatius with authority to enter into contracts with artists that enables her effectively and efficiently to discharge her duties and fulfill the ACC's cultural mission. Nor has defendant presented any such alternatives. The court agrees with plaintiff that Ms. Ignatius' ability to enter into contracts was integral to the successful "plan[ning], coordinat[ing] and carry[ing] out [the United States Information Agency's] cultural programs," and to "manag[ing] the activities of the Cultural Center" efficiently. Pl.'s Mem. at 28–29 (quoting PX 1 (Officer Evaluation Report for Mary Ann Ignatius dated 6/10/91), at 1); *see also Roy,* 38 Fed.Cl. at 189 (framing the pertinent inquiry as "whether contractually binding authority is necessary or essential to the successful performance of [the employee's] duties"). The court therefore concludes that Ms. Ignatius possessed implied authority to contract on behalf of the government.

### C. Whether Mary Ann Ignatius Ratified the Alleged Bailment Contract

Because the court finds that Mr. Van Kerkhove did not possess actual contracting authority, *see* Part II.B.1–2, *supra,* plaintiff can establish the formation of a valid bailment contract with the government only if she carries her burden of proving that Ms. Ignatius, who possessed actual contracting authority, *see* Part II.B.3, *supra,* ratified the alleged bailment agreement.

### 1. Standard for Ratification

"Ratification is 'the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.'" *Schism v. United States,* 316 F.3d 1259, 1289 (Fed.Cir.2002) (quoting Restatement (Second) of Agency § 82 (1958)). For ratification to be effective, a superior must not only (1) have possessed authority to contract, but also (2) have fully known the material facts surrounding the unauthorized action of her subordinate, and (3) have knowingly confirmed, adopted, or acquiesced to the unauthorized action of her subordinate. *Cal. Sand & Gravel, Inc. v. United States,* 22 Cl.Ct. 19, 27–28 (1990); *see also Khairallah v. United States,* 43 Fed.Cl. 57, 64 (1999) ("Ratification requires knowing acquiescence to an unauthorized agreement by a superior who has contracting authority."). The court discusses each element of ratification in turn.

Where, as here, "an agent has acted without authority and it is claimed that the principal has thereafter ratified his act, such ratification can only be based upon a full knowledge of all the facts upon which the unauthorized action was taken." *United States v. Beebe,* 180 U.S. 343, 354, 21 S.Ct. 371, 45 L.Ed. 563 (1901). Effective ratification requires a detailed level of factual knowledge: The ratifying official must have known, at the time of ratification, the material facts and circumstances pertinent to the agreement at issue. *See Schism,* 316 F.3d at 1294 ("[F]ull . . . knowledge or awareness of the conduct being ratified is necessary for ratification." (citing *Beebe,* 180 U.S. at 354, 21 S.Ct. 371; *Brooks v. Dewar,* 313 U.S. 354, 360–61, 61 S.Ct. 979, 85 L.Ed. 1399 (1941) & Harold G. Reuschlein & William A. Gregory, The Law of Agency and Partnership § 30, at 74 (West 2d ed. 1990)) ("At the time of ratification, the purported principal must have knowledge of all material facts concerning the transaction.")); *see also Dolmatch Group, Ltd. v. United States,* 40 Fed.Cl. 431, 438 (1998) ("[R]atification can only occur where the person ratifying the agreement has knowledge of the material facts pertaining to the agreement."); *Garza v. United States,* 34 Fed.Cl. 1, 21 (1995) ("[F]or a superior official to ratify a contract, that official must have full knowledge of all the details of the matter upon which the unauthorized action was taken."); *Hazeltine Corp. v. United States,* 10 Cl.Ct. 417, 441 (1986) (stating that

for ratification to be effective, the principal "must have known all the facts and circumstances pertinent to the act at issue"). If the ratifying official lacks "full knowledge[,] ... no ratification can be based upon any act of his." *Beebe,* 180 U.S. at 354, 21 S.Ct. 371. This is the case even where the ratifying official's ignorance of the material facts surrounding the subordinate's unauthorized act "ar[ose] from the neglect of the [ratifying official]. Knowledge of the facts is the essential element of ratification, and must be shown or such facts proved that its existence is a necessary inference from them." *Id.*

■ Full knowledge of the material facts is necessary, but not sufficient, for effective ratification. The ratifying official must also "demonstrate[ ] acceptance of the contract." *Harbert/Lummus,* 142 F.3d at 1434; *Henke v. United States,* 43 Fed.Cl. 15, 27 (1999) ("Ratification thus requires not only that there be some conduct or inaction constituting acquiescence, but that the acquiescence must be knowing."). Silence on the part of the authorized official "in and of itself is not sufficient to establish a demonstrated acceptance of the contract." *Harbert/Lummus,* 142 F.3d at 1434; *Howard,* 31 Fed.Cl. at 314 ("Silence or inaction on the part of authorized officials without more does not constitute ratification."). Nor is "an official's mere presence when promises are made [sufficient to] establish that he or she possessed actual knowledge that such promises were in fact made." *Humlen v. United States,* 49 Fed.Cl. 497, 504–05 (2001). Because the ratifying party must manifest her knowing acceptance of the specific contract at issue, ratification cannot be inferred from a plaintiff's prior dealings with the same government agency. *Doe v. United States,* 48 Fed. Cl. 495, 504 (2000) ("[A] 'plaintiff's prior experience with the [agency] is not sufficient as proof [of ratification] with respect to the contract at issue.' ") (quoting *Henke,* 43 Fed. Cl. at 27). This is especially the case where, as here, the ratifying official did not participate in plaintiff's prior dealings with the agency. *See Henke,* 43 Fed.Cl. at 27–28 ("[P]laintiff has to have evidence of something more than the possibility that [the ratifying official] may have known about the prior [dealings].").

For ratification to have occurred here, Ms. Ignatius must have known specifically about and consented specifically to a commitment that the United States store Ms. Leonardo's artwork following the 1990 exhibition, at the risk of the United States, into the indefinite future—a period encompassing the winter of 1996–97 when the artwork was destroyed.

### 2. The Development of the Issue of Ratification in Prior Proceedings

■ In *Leonardo I,* the court allowed plaintiff's motion for limited discovery under RCFC 56(f) "to determine the existence of the implied actual authority of Mr. Van Kerkhove and Ms. Ignatius." 55 Fed.Cl. at 349. Following that discovery, plaintiff advanced the theory that a valid contract had been formed because Ms. Ignatius ratified the alleged agreement between plaintiff and Mr. Van Kerkhove. *See Leonardo II,* 60 Fed.Cl. at 131. Although the court concluded that "the contract alleged [by plaintiff was] a bailment contract," *id.* at 129, the court denied summary judgment for plaintiff on the issue of ratification for two reasons. *See id.* at 133.

First, the court found "whether Ms. Ignatius approved the alleged contract" to be "factually disputed." *Id.* at 131. Noting that defendant had submitted a written declaration by Ms. Ignatius stating that she "[did] not, in fact, recall any agreement with plaintiff regarding the exhibition or storage of plaintiff's artwork," *id.* (citation omitted), the court concluded that "[t]here [was] no uncontroverted evidence that Ms. Ignatius approved the alleged contract between plaintiff and defendant" and denied summary judgment, *id.*

Second, the court examined the evidence offered by plaintiff to support her ratification theory and concluded that none of this evidence, separately or taken as a whole, was adequate to prove ratification as a matter of law. *Id.* In particular, plaintiff offered statements from her own written declaration. One such statement discussed a conversation between plaintiff an Ms. Ignatius, which purportedly occurred when plaintiff dined at Ms. Ignatius' home on October 18, 1990, prior to

the October 31, 1990 opening of the exhibition:

> At [the October 18, 1990 dinner], Ms. Ignatius and I discussed the agreement that I had worked out with Jan Van Kerkhove. We specifically discussed the invitations for the show, framing for my artworks, how and where I could acquire art supplies in Brussels, assistance with the show from her assistant[,] ... the vernissage, public relations activities for the show, photography of the show, hanging the show, my lecture, storage of my artwork and supplies after the show and efforts to help me find new shows.

*Id.* (quotation and citation omitted). The court assumed that the facts alleged by plaintiff were true, but found this detailed statement insufficient to prove ratification of a bailment agreement as a matter of law because "the fact that plaintiff and Ms. Ignatius discussed the terms of the alleged contract and logistics of the exhibition does not mean that Ms. Ignatius approved the alleged contract." *Id.; cf. Harbert/Lummus,* 142 F.3d at 1434 (noting that ratification requires "demonstrated acceptance" of the contract at issue).

The court also found the following portion of plaintiff's written declaration insufficient to prove ratification of the alleged bailment contract:

> I also attended a number of meetings with Jan Van Kerkhove and Mary Ann Ignatius, then Cultural Attaché for the U.S. Embassy in Belgium, at their offices at the American Cultural Center. I had frequent contact with Mary Ann Ignatius during this time. She was intimately involved in preparing for the exhibition, and was fully aware of every detail of the show. Every aspect of the exhibition had to meet with her approval, and it did. Exhibit D.

*Leonardo II,* 60 Fed.Cl. at 131 (quotation omitted). The court reasoned that "the fact that Ms. Ignatius approved '[e]very aspect of the exhibition' does not necessarily mean that she approved an agreement that Mr. Van Kerkhove and plaintiff discussed." *Id.; cf. Beebe,* 180 U.S. at 354, 21 S.Ct. 371 (holding that ratification requires "full knowledge of all the facts upon which the unautho-

rized action was taken"); *Harbert/Lummus,* 142 F.3d at 1434 (noting that ratification requires "demonstrated acceptance" of the contract at issue). Plaintiff's citation to "Exhibit D" as documentary support for this portion of her declaration led the court to a photograph of Ms. Ignatius and Mr. Van Kerkhove standing in front of one of plaintiff's paintings. *Leonardo II,* 60 Fed.Cl. at 131. Consistent with the standards for ratification discussed above, *see* Part II.C.1, *supra,* the court concluded that the photograph "[did] not provide support for the argument that Ms. Ignatius approved an agreement between plaintiff and Mr. Van Kerkhove." *Id.*

### 3. Plaintiff's Trial Evidence Concerning Ratification

In her pretrial memorandum, plaintiff renewed her argument that, even if Mr. Van Kerkhove lacked independent authority to contract, his agreement with plaintiff was ratified by Ms. Ignatius. Plaintiff promised that, in contrast to the summary judgment proceeding, evidence in the form of her "contemporaneous personal journal," would be introduced at trial to confirm plaintiff's testimony that "Ms. Ignatius approved the agreement that Ms. Leonardo had worked out with Jan Van Kerkhove, including the details of the American Cultural Center show itself, storage of the artwork after the show and efforts to locate new shows." Pl.'s Mem. at 8. Plaintiff's pretrial memorandum stated that "[t]he agreement to store the artwork after the November 1990 show, and the efforts to locate additional exhibitions were of particular importance to Mary Ann Ignatius." *Id.*

At trial, plaintiff testified that she met with Ms. Ignatius at the ACC on October 17, 1990 and was a dinner guest at the home of Ms. Ignatius the following day. *See generally* Tr. at 113:2–117:11. Plaintiff testified that she and Ms. Ignatius discussed only plaintiff's art exhibition on October 17, 1990, *id.* at 114:10–20, but that they "really got down to discussing everything," *id.* at 114:22–23, on October 18, 1990 when she was a dinner guest at Ms. Ignatius' home, *id.* at 114:25, 115:4. In particular, plaintiff testified that, at the dinner,

we discussed everything all over again. [Ms. Ignatius] was in perfect agreement and thought it was a great idea. She particularly favored the idea of trying to get this residency at Kasterlee.[5] She thought that would be a very prestigious thing for the United States to be able to have an American artist there.

*Id.* at 115:16–22. Ms. Leonardo was then prompted by her attorney to discuss whether she and Ms. Ignatius also had "specific discussions [at the October 18, 1990 dinner] . . . about what would happen to [plaintiff's] artwork at the end of the . . . 1990 show at the American Cultural Center." *Id.* at 115:24–16:2. In response to her counsel's question, plaintiff then testified that, during the dinner, she and Ms. Ignatius discussed the storage of plaintiff's artwork in some detail:

> [We discussed] [t]hat they would take down the show after I departed and that they would store the artwork where they had it at that present time, in that storage room, which I approved of, because I thought it was an excellent storage room, and that they would continue to get shows for me and that I would assist them in that.

*Id.* at 116:5–11.

Ms. Leonardo also was prompted by her counsel to discuss whether she and Ms. Ignatius had "specific discussions [at the October 18, 1990 dinner] about the United States working to find additional shows for [plaintiff] throughout Belgium." *Id.* at 116:13–15.

After plaintiff responded in the affirmative, *id.* at 116:16, her counsel then encouraged her to describe "the nature of those discussions," *id.* at 116:17. Plaintiff testified that the parties discussed at least two opportunities—a printmaking residency for plaintiff at Kasterlee and exhibitions of plaintiff's stored artwork in Belgian cultural centers:

> Well, we discussed first Kasterlee because that was something new and unique,[6] and we had already done [Belgian] cultural centers before and wanted to do that. [Ms. Ignatius] realized that that's a very important part of the fabric of the art scene in Belgium, and we were beginning to develop some other ideas, too.

*Id.* at 116:18–23 (footnote added).

As promised in her pretrial memorandum, Pl.'s Mem. at 8, plaintiff also offered as evidence of ratification an excerpt from her "contemporaneous personal journal," an appointment calendar in which plaintiff recorded her daily activities. *See generally* PX 107 (Pages from plaintiff's appointment calendar dated 10/11/90–12/21/90). Plaintiff noted many personal details in her appointment calendar. *See, e.g.,* PX 107 (10/22/90 entry: "Make breakfast; Groceries; Photo Session; Jan—develops photos; draw horses; . . . write letters . . . left—house keeper; hand wash; bank—exchange . . . manicure; wash hair; make dinner"). Plaintiff also recorded details of her social life, *see, e.g., id.* (10/18/90 entry: "Lunch with Philip—Indian Paki-

---

5. According to plaintiff's pretrial memorandum, "Ms. Ignatius was interested in securing Ms. Leonardo a printmaking residency at the prestigious Frans Masereel Centrum in Kasterlee, Belgium. Ms. Leonardo and Ms. Ignatius had numerous conversations regarding the Kasterlee residency and Ms. Leonardo wrote at least one letter to Ms. Ignatius (and others to Jan Van Kerkhove) regarding the Kasterlee position." Pl.'s Mem. at 8. Plaintiff offered into evidence letters to Mr. Van Kerkhove referring to the Kasterlee position, *see, e.g.,* PX 88 (Letter from plaintiff to Jan Van Kerkhove dated 3/1/93); PX 91 (Letter from plaintiff to Jan Van Kerkhove dated 7/12/93); PX 92 (Letter from plaintiff to Jan Van Kerkhove dated 7/28/94); PX 93 (Letter from plaintiff to Jan Van Kerkhove dated 10/30/96). However, none of these letters mentions Ms. Ignatius and no letter from plaintiff to Ms. Ignatius concerning Kasterlee or any other subject was introduced into evidence at trial.

6. Plaintiff's direct testimony indicated that the Kasterlee residency was a "new and unique" idea proposed by Ms. Ignatius at the October 18, 1990 dinner. Tr. at 116:18–19. This statement contradicted previous direct testimony by plaintiff that the Kasterlee residency first was proposed by Mr. Van Kerkhove during a 1988 meeting with plaintiff. *See id.* at 89:13–25 (colloquy between plaintiff and plaintiff's counsel). To clarify this discrepancy, defendant's counsel asked plaintiff whether Kasterlee was "an idea that Mr. Van Kerkhove had suggested." *Id.* at 236:22–23. Plaintiff replied, "Yes," *id.* at 236:24, and went on to testify that she and Mr. Van Kerkhove "[had] been talking about [Kasterlee] since 1988," *id.* at 237:1. Defendant's counsel asked plaintiff to confirm that "[Mr. Van Kerkhove] suggested it in 1988," and plaintiff replied, "Yes." *Id.* at 237:2–3 (colloquy between plaintiff and defendant's counsel).

stan"); *id.* (11/9/90 entry: "dinner party w[ith] Marlis"); *id.* (12/18/90 entry: "dinner [at] Raw Deal; John brings me home; visit w[ith] Veronica."), and details of her professional life, *see, e.g., id.* (11/2/90 entry: "meet Brian the Architect. Show portfolio"); *id.* (12/3/90 entry: "U.S.I.S[.]—Meet Gil Duziano; very good"); *id.* (12/4/90 entry: "Meet[ing] [with] Gil Duziano[;] I'm the candidate for C[agnes] sur la Mer").

At trial, plaintiff directed the court's attention to the pages of her appointment calendar corresponding to October 17 and 18, 1990—dates that plaintiff met with Ms. Ignatius—as evidence that Ms. Ignatius ratified the alleged bailment contract. *See* Tr. at 113:22–117:20. However, these pages do not confirm plaintiff's testimony concerning a discussion about the details of an agreement ratified by Ms. Ignatius. The page corresponding to October 17, 1990 states, "Jan and Marian [sic] to Jean P[ierre] Ramp[al] Concert[.] I stay home [to] work." PX 107 (10/17/90 entry). The page corresponding to October 18, 1990 states, "Dinner w[ith] Mariane Ignacius [sic]—ACO[.] [7] Concert at USIS[.] Champagne—Hors [d'oeuvres.] Luc—pianist[.] Michael—violinist[.] Schubert and Fran[c]k[.][T]o Marianne[']s [sic]. Jan and I talk." *Id.* (10/18/90 entry). In addition to the notations concerning the October 18, 1990 dinner with Ms. Ignatius and Mr. Van Kerkhove, plaintiff apparently met with them on other occasions. *See id.* (10/23/90 entry: "Lunch [at] Conways w[ith] Jan and Marianne [sic]. Food not good."); *id.* (10/27/90 entry: "dinner w[ith] Jan[;] Ital[ian] Restaurant"); *id.* (10/29/90 entry: "Make dinner for Jan and Marianne [sic].").

Plaintiff did not produce any other evidence at trial to demonstrate that Ms. Ignatius ratified plaintiff's alleged agreement with Mr. Van Kerkhove with respect to bailment. However, plaintiff offered into evidence letters from herself to Mr. Van Kerkhove which purported to support her arguments concerning the terms of the agreement—particularly the terms relating to the storage of plaintiff's artwork following the 1990 exhibition—and the government's eventual breach. *See* PX 73, 74, 81, 82, 84, 88, 90–95 (1989–1997 Let-

ters from plaintiff to Jan Van Kerkhove). Several letters ask Mr. Van Kerkhove about his dealings with directors of certain Belgian cultural centers. *See* PX 88 (Letter from plaintiff to Jan Van Kerkhove dated 3/1/93); PX 90 (Letter from plaintiff to Jan Van Kerkhove dated 4/25/93). Other letters ask Mr. Van Kerkhove about the status of the Kasterlee residency. *See* PX 91(Letter from plaintiff to Jan Van Kerkhove dated 7/12/93), at 2; PX 92 (Letter from plaintiff to Jan Van Kerkhove dated 7/28/94); PX 93 (Letter from plaintiff to Jan Van Kerkhove dated 10/30/96). However, none of plaintiff's letters to Mr. Van Kerkhove mentions Ms. Ignatius or, until late 1996, any agreement regarding the storage of plaintiff's artwork. *See* PX 93 (Letter from plaintiff to Jan Van Kerkhove dated 10/30/96) (referring to a "USIS offer to continue storing my art"); PX 94 (Letter from plaintiff to Jan Van Kerkhove dated 11/19/96) (same). Moreover, the letter from plaintiff to Ms. Ignatius "regarding the Kasterlee position" mentioned in plaintiff's pretrial memorandum as support for Ms. Ignatius' ratification of the agreement with Ms. Leonardo, Pl.'s Mem. at 8, and featured in plaintiff's exhibit list, Pl.'s Ex. List at 6, was not offered into evidence at trial.

### 4. Whether Plaintiff Sustained Her Burden of Proving Ratification

Plaintiff's pretrial memorandum set out the trial strategy of plaintiff and her expected result in light of the fact that the United States, in its pretrial filings, had not sought to introduce any witnesses or exhibits, except for impeachment purposes. *See* Def.'s Witness List (offering no witnesses to support its case-in-chief); Def.'s Ex. List (offering no exhibits to support its case-in-chief). Emphasizing that "the United States [would] not produce *any* witnesses or *any* exhibits at trial to contradict Ms. Leonardo's account of what happened," plaintiff concluded that "the uncontroverted evidence to be presented at trial—consisting of Ms. Leonardo's testimony and documentary evidence—[would] prove [her case]." Pl.'s Mem. at 2. According to plaintiff's pretrial memorandum:

---

7. According to plaintiff, "ACO" means "American Cultural Officer." Tr. at 227:9–11.

The Court denied Ms. Leonardo's cross-motion for summary judgment because Mary Ann Ignatius' now-inadmissible declaration suggested that there was a dispute of fact as to whether she approved the agreement that Ms. Leonardo worked out with Mr. Van Kerkhove.

. . . .

The factual disputes that precluded summary judgment on this issue will not materialize at trial. As noted, Mary Ann Ignatius and Jan Van Kerkhove will not testify, and their declarations are inadmissible hearsay. Ms. Leonardo will, however, testify at trial. She will confirm that Jan Van Kerkhove, on behalf of the United States, committed to show her art and to store it at the American Cultural Center after the show, and that Mary Ann Ignatius approved that agreement in full. This evidence will be uncontroverted and prove, as a matter of law, that Ms. Leonardo's contract with the United States was authorized.

*Id.* at 23–24 (footnote omitted). Plaintiff's pretrial memorandum also promised that her "uncontroverted" evidence would prove that Ms. Ignatius ratified every term in the alleged bailment:

In her declaration in support of her opposition to the government's summary judgment motion, Ms. Leonardo stated that Mary Ann Ignatius approved every aspect of the exhibition. Ms. Leonardo intended this language to include those portions of the contract that would occur after the 1990 show. Ms. Leonardo will clarify this point in detail in her trial testimony.

*Id.* at 24 n. 45.

After the close of evidence, plaintiff's counsel argued in summation that plaintiff had shouldered her burden of proof on the issue of ratification:

The undisputed testimony at trial from Ms. Leonardo demonstrated that Mary[ ][A]nn Ignatius had full knowledge of the agreement that [plaintiff] worked out with Jan Van Kerk[h]ove, including the agreement to store the art and to look for shows in the future. The undisputed evidence in the record also demonstrates that Mary[ ][A]nn Ignatius gave her approval to

that contract. This evidence is sufficient to show . . . legal ratification.

Tr. at 285:6–17 (closing argument of plaintiff's counsel); see also id. at 311:3–8 ("There is undisputed testimony that Ms. Ignatius in October of 1990 approved every facet of the agreement that Ms. Leonardo worked out between the United States and her for storing the artwork, for staging the show, and for looking for additional shows.") (closing argument of plaintiff's counsel).

Defendant argued that plaintiff's evidence is insufficient as a matter of law to prove that Ms. Ignatius ratified the alleged bailment contract. First, defendant noted that plaintiff did not submit independent evidence to corroborate the substance of her testimony. *See id.* at 295:14–20 ("The only testimony we have that there was extensive agreement, or even what one could call formal agreement . . . is Ms. Leonardo's. Our case . . . is based on the absence of contemporaneous evidence that would corroborate that in any way.") (closing argument of defendant's counsel). Defendant insisted that the plaintiff-authored documents offered into evidence at trial do not factually support her ratification argument. Focusing on plaintiff's appointment calendar, defendant argued:

Plaintiff has [alleged that] she had this meeting . . . with Ms. Ignatius at her home . . . where this contract that she worked out with Mr. Van Kerk[h]ove was then ratified . . . by Ms. Ignatius. Plaintiff's . . . journal [entered into evidence shows that] . . . on October 18, it's dinner with Mary[ ][A]nn Ignatius and the concert at USIS with champagne and hors d'oeuvres. . . . She goes to the concert. She has dinner. She writes down the first names of the pianist and violinist. She writes down the composers of the musical works performed . . . . Says nothing about business being transacted, not even a note, not even Mary[ ][A]nn finally agrees to everything I've been trying to get Jan to do for me for the last two years.

*Id.* at 300:17–301:12.

Defendant proposed that it is unlikely that plaintiff, a "rather prolific correspondent," *id.* at 295:8, who kept a "rather meticulous jour-

nal ... for decades," *id.* at 300:22–24, would not have documented either the formation or ratification of her alleged bailment contract. *See id.* at 295:6–9 ("[Plaintiff would] also have [the court] believe that [the specific terms of her agreement] w[ere] never written down, that she ... never wrote a letter confirming that so-called agreement."). Defendant's counsel argued in summation that plaintiff had offered

> no testimony that would support [ratification]. And, more important in our view, setting aside the testimony, there's no contemporaneous evidence, despite the meticulousness of the journal, the frequent correspondence, nothing contemporaneous to say ["]remember the night when we agreed,["] or ["]that agreement, I'm glad you have agreed, Mary[ ][A]nn, it was wonderful talking to you.["] Nothing. Nothing.

*Id.* at 302:9–17. Defendant argued that plaintiff failed to sustain her burden of proof at trial because "[n]ot an iota of *new* evidence [was] introduced at trial ... to *support* Ms. Leonardo's [case]." Def.'s Mem. at 4.

Defendant also suggested that plaintiff's testimony and evidence "has been ... embellished, corrected, [and] tailored ... to fit [p]laintiff's theory of the case all these years later." Tr. at 291:20–24. Conceding that plaintiff's testimony has "kernels of truth in it," *id.* at 292:22, defendant insisted that "distinct contrasts in certain parts of Ms. Leonardo's story," make it implausible. *Id.* at 294:12–13. Defendant contrasted plaintiff's "specific memories of specific things that are necessary to [her] story," *id.* at 294:14–15, with plaintiff's "lack of memory" of other details concerning the formation of the alleged contract and the terms agreed to by the parties, id. at 294:17–19, and argued that plaintiff's account of Ms. Ignatius ratifying the alleged bailment contract is not credible:

> It's really not plausible [that] Ms. Ignatius would have, having heard about this, said ["]oh yes I ratified that contract at a dinner party,["] never made a record of it, never having seen Ms. Ignatius at the office .... Ms. Leonardo never wrote a letter, never wrote a note confirming it, never in her journal made a note or a star o[r]

any kind of an ex[clam]ation mark suggesting that this was an important turning point in the contract.

> ....

> [These] embellishments ... stem only ... from Ms. Leonardo's testimony years after the fact, testimony that's ... conveniently detailed on the details necessary, conveniently vague on the vague words convenient to be vague.... [T]his just is not a story of a contract. It's a story of an unfortunate loss at an American center.

*Id.* at 307:3–24.

As both parties note, the only evidence offered to prove that Ms. Ignatius was aware of the specific terms of plaintiff's agreement and that Ms. Ignatius acquiesced to those specific terms are plaintiff's testimony that she discussed each term of the agreement at the October 18, 1990 dinner with Ms. Ignatius, and a document authored by plaintiff that purportedly corroborated that testimony. Id. at 285:4–14 ("The question of [ratification] is addressed both by Ms. Leonardo's testimony and ... her personal journal. ... The undisputed evidence in the record ... demonstrates that [Ms.] Ignatius gave her approval to that contract.") (closing statement of plaintiff's counsel); id. at 300:17–301:12 (closing statement of defendant's counsel referring to plaintiff's testimony and appointment calendar as the only evidence offered to prove ratification). Plaintiff argues that presenting such "uncontroverted" evidence at trial created a rebuttable presumption that Ms. Ignatius had ratified the alleged agreement, and that defendant, by not presenting independent evidence at trial, failed to shoulder the burden of disproving plaintiff's ratification theory. Plaintiff's counsel argued in summation:

> The government likes to say that it is implausible that Mary[ ][A]nn Ignatius thought that she was ratifying a contract ... when she, at a meeting at her house, approved the agreement that Ms. Leonardo worked out with Mr. Van Kerk[h]ove. That's not implausible.... If it's implausible, the government was more than welcome to bring in those officials [to] testify that not only was it implausible, that [it] wasn't what happened. That testimony

... from those officials, is not before the [c]ourt. There is no correspondence from the United States disclaiming any obligation to Ms. Leonardo.

*Id.* at 308:24–309:12 (summation of plaintiff's counsel).[8]

It is the court's view, however, that defendant's decision not to offer any evidence, whatever its wisdom as a matter of trial strategy, does not discharge plaintiff's obligation to present evidence satisfying her own burden of proof. After carefully considering plaintiff's testimony and the other evidence presented at trial, the court agrees with defendant that plaintiff has not sustained her burden of proving by a preponderance of the credible evidence that Ms. Ignatius possessed the "full knowledge of all the facts upon which [Mr. Van Kerkhove's] unauthorized action was taken," which is required for effective ratification, *Beebe*, 180 U.S. at 354, 21 S.Ct. 371, or that Ms. Ignatius "demonstrated [her] acceptance of the contract," *Harbert/Lummus*, 142 F.3d at 1434.

Plaintiff's pretrial memorandum stated that plaintiff would "clarify ... [with] detail[ed] ... trial testimony" that "Mary Ann Ignatius approved every aspect of the exhibition ... includ[ing] those portions of the contract that would occur after the 1990 show." Pl.'s Mem. at 24 n. 45. However, plaintiff's testimony concerning ratification is problematic for two reasons. As a threshold matter, the court finds that plaintiff's testimony, see Tr. at 115:23–116:11, until aided by leading questions from her counsel, was even less illuminating than her declaration regarding ratification by Ms. Ignatius of the alleged agreement to store plaintiff's artwork.[9]

Even when prompted by her attorney to describe the "specific discussions with [Ms. Ignatius] about what would happen to [the] artwork after the end of the ... show," Tr. at 115:24–116:1, plaintiff's testimony was nearly identical to the written declaration offered in support of her failed partial motion for summary judgment on the issue of contracting authority. *Compare Leonardo II*, 60 Fed.Cl. at 131 (finding the statement in plaintiff's declaration that "Ms. Ignatius and [plaintiff] ... specifically discussed [details of the 1990 exhibition, including] storage of [plaintiff's] artwork and supplies after the show and efforts to help [her] find new shows" insufficient to prove ratification because it did not demonstrate Ms. Ignatius' acquiescence to the terms of the alleged agreement) *with* Tr. at 116:6–11 (statement of plaintiff that she and Ms. Ignatius specifically discussed "that they would store the artwork ... in that storage room ... and that they would continue to get shows for me and that I would assist them in that"). The court agrees with defendant that plaintiff's testimony, by itself, does not indicate that Ms. Ignatius knowingly acquiesced to an alleged agreement with Mr. Van Kerkhove to store plaintiff's artwork at the ACC following the 1990 exhibition. *See* Tr. at 303:2–5; *Harbert/Lummus*, 142 F.3d at 1434.

Even if plaintiff's testimony were sufficient by itself to prove ratification by Ms. Ignatius, the court finds plaintiff's testimony internally inconsistent and therefore not credible. During her direct testimony, plaintiff stated that Ms. Ignatius was involved in discussions concerning the details of plaintiff's exhibition long before plaintiff arrived in Brussels in October, 1990. *See* Tr. at 114:15–20. When

---

8. The structure of plaintiff's argument appears to follow a negligence framework. See Pl.'s Mem. at 30–31 (describing the shifting burden of proof in breach of bailment cases between private parties); see also infra Part II.D.1 (discussing same). The court believes that this framework is inapposite in the present context of proving the formation of a contract with the government.

9. Plaintiff's declaration stated: " 'Ms. Ignatius and I discussed the agreement that I had worked out with Jan Van Kerkhove. We specifically discussed the ... storage of my artwork.' " *Leonardo II*, 60 Fed.Cl. at 131. At another point in her declaration, Ms. Leonardo stated,

I also attended a number of meetings with Jan Van Kerkhove and Mary Ann Ignatius, then Cultural Attaché for the U.S. Embassy in Belgium, at their offices at the American Cultural Center. I had frequent contact with Mary Ann Ignatius during this time. She was intimately involved in preparing for the exhibition, and was fully aware of every detail of the show. Every aspect of the exhibition had to meet with her approval, and it did.

*Id.* In her unaided testimony, however, Ms. Leonardo stated that "we discussed everything all over again. [Ms. Ignatius] was in perfect agreement and thought it was a great idea." Tr. at 115:16–18.

questioned during cross-examination about the timing of these discussions, plaintiff could not recall when they occurred, but stated that Mr. Van Kerkhove informed her that Ms. Ignatius approved their alleged bailment agreement "prior to [plaintiff's] leaving the United States." *Id.* at 230:11–231:7 (colloquy between plaintiff and defendant's counsel in which plaintiff was "not certain" whether these discussions occurred during the fall of 1990). According to plaintiff,

> [Ms. Ignatius] and Mr. Van Kerkhove obviously had been working on this a long time before I had gotten there, and he had just been the go between between Ms. Ignatius and myself, so everything had been worked out prior to me ever leaving the United States between them. We were just fine tuning then when I first was at the gallery [after arriving in Brussels for the exhibition].

Tr. at 114:15–21. Ms. Ignatius assumed her duties at the ACC less than two weeks before plaintiff arrived in Brussels for the 1990 exhibition. Compare PX 1 (Officer Evaluation Report for Mary Ann Ignatius dated 6/10/91) (stating that Ms. Ignatius assumed her duties on September 29, 1990) with Tr. at 110:25 (statement by plaintiff that she arrived in Brussels "on the 11th [of October]"). It is implausible that Mr. Van Kerkhove acted as a "go between" between plaintiff and Ms. Ignatius during discussions that took place "a long time" before Ms. Ignatius assumed her duties at the ACC.

To establish that Ms. Ignatius ratified the alleged agreement to store plaintiff's artwork at the ACC, plaintiff testified that Ms. Ignatius was involved in discussions about the ACC's effort to locate venues for the stored artwork following the 1990 exhibition. In contrast to her testimony concerning pre-exhibition discussions with Ms. Ignatius, plaintiff's testimony on the parties' ongoing performance was quite detailed. However, this testimony also was self-contradictory. Plaintiff initially testified that she met face-to-face with Mr. Van Kerkhove and Ms. Ignatius in 1993. Tr. at 155:23–25, 156:24. At that meeting, plaintiff claimed that Ms. Ignatius and Mr. Van Kerkhove proposed a "new idea" about an exhibition of plaintiff's art-

work in Liege, Belgium. *Id.* at 155:22–156:2, 156:24–25. However, when questioned by her attorney and the court about whether Ms. Ignatius "personally participate[d] in ... discussions [with plaintiff] after 1991," *id.* at 156:14–16 (question by plaintiff's counsel), plaintiff contradicted her previous testimony and stated:

> [Ms. Ignatius] wasn't in the city when I was there in 1993 was my understanding, and of course, everything that [Mr. Van Kerkhove] ever discussed with me, he had to talk to her first. He would pass it on to me after he had had discussions with her.

*Id.* at 156:17–21 (emphasis added).

In the court's view, plaintiff's selectively specific and internally inconsistent testimony concerning ratification appears calculated to suit her attorney's theory of the case. Because the court questions the credibility of plaintiff's testimony, *see* RCFC 52(a) ("[D]ue regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."); *cf. Smith v. C.I.R.*, 800 F.2d 930, 935 (9th Cir.1986) ("[T]he trial court is not compelled to accept even uncontroverted testimony when it doubts the credibility of a witness."), it is unwilling to rely on this testimony alone as proof of ratification. Accordingly, the court considers whether plaintiff's documentary evidence adequately supports her testimony such that plaintiff has satisfied her burden of proving ratification by Ms. Ignatius.

Plaintiff points primarily to the October 18, 1990 entry in her appointment book as evidence of ratification. *See* PX 107. Although this entry notes that plaintiff dined with Ms. Ignatius on October 18, 1990, it does not indicate that any business was conducted during the October 18, 1990 dinner. The court agrees with counsel to plaintiff that it is possible to "mix business with pleasure." *See* Tr. at 258:9–10 (question by plaintiff's counsel). However, the court finds it problematic that, in contrast to other entries in plaintiff's appointment calendar, which specifically note the professional tenor of certain engagements by referring to them as "meet-

ings"[10] and by referencing plaintiff's artwork or profession in some way, *see, e.g.,* PX 107 (12/3/90 entry: "U.S.I.S[.]—Meet with Gil Duziano; very good."); (12/12/90 and 12/13/90 entries: "galleries—show portfolio"), plaintiff's October 18, 1990 entry details the meal and entertainment, but does not, except possibly for a reference to a conversation between Ms. Leonardo and Mr. Van Kerkhove, indicate that any business was transacted. Plaintiff's October 18, 1990 entry reads, "Dinner w[ith] Marianne Ignacius [sic]—ACO[.] Concert at USIS[.] Champagne—Hors [d'oeuvres.] Luc—pianist[.] Michael—violinist[.] Schubert and Fran[c]k[.] [T]o Marianne[']s. Jan and I talk." *Id.* This entry more closely resembles plaintiff's notations for social engagements, *see id.* (12/18/90 entry: "dinner [at] Raw Deal; John brings me home; visit w[ith] Veronica"), than notations for professional ones, *see id.* (12/4/90 entry: "Meet[ing] [with] Gil Duziano[;] I'm the candidate for C[agnes] sur la Mer"). The October 18, 1990 entry in plaintiff's appointment book reveals only that plaintiff dined with Ms. Ignatius; it does not indicate that any business involving Ms. Ignatius took place that evening. Indeed, the only possible reference to a business conversation ("Jan and I talk.") does not include Ms. Ignatius. This evidence does not bolster plaintiff's otherwise uncorroborated testimony to establish that Ms. Ignatius either knew the "material facts pertaining to the agreement," *Dolmatch,* 40 Fed.Cl. at 438, or that Ms. Ignatius knowingly acquiesced to the terms of that alleged agreement, *Henke,* 43 Fed.Cl. at 27, particularly the terms relating to the storage of plaintiff's artwork.

Nor do plaintiff's letters to Jan Van Kerkhove indicate that Ms. Ignatius ratified the alleged bailment contract. Although several of these letters mention directors of the Belgian cultural centers, and although several other letters mention the Kasterlee residency that plaintiff allegedly discussed with Ms. Ignatius, not one of these letters mentions Ms. Ignatius. The court cannot conclude from plaintiff's letters to Mr. Kerkhove that Ms. Ignatius possessed "full knowledge of all the details" of the parties' alleged agreement to store plaintiff's artwork and look for other shows, *Garza,* 34 Fed.Cl. at 21, or that Ms. Ignatius "demonstrated [her knowing] acceptance of" the alleged agreement, *Harbert/Lummus,* 142 F.3d at 1434.

During cross-examination, plaintiff attempted to deflect the inconclusiveness of her documentary evidence by explaining that she would not typically use the term "contract" to describe her arrangements with the ACC because "[t]hat's your [defendant's counsel's] language. I speak a different language." Tr. at 200:3–4; *see also id.* at 223:16 (similar statement by plaintiff that she would not commonly use the term "contract" because "[a]rtists don't think that way."). Despite her claim that she "speak[s] a different language," the court notes that several of plaintiff's own letters are couched in formal terms and were introduced at trial as evidence of elements of the alleged agreement. *See, e.g.,* PX 73 (Letter from plaintiff to Jan Van Kerkhove of 10/30/89) ("In the meanwhile we've spoken on the telephone and I would definitely like to have the date for the Exhibition in June '90 [that] you offered."). The court is troubled by the self-serving tenor of the correspondence from Ms. Leonardo to Mr. Van Kerkhove beginning in the fall of 1996, when the storage of plaintiff's art first emerges as a subject in plaintiff's documentary evidence. *See* PX 93 (Letter from plaintiff to Jan Van Kerkhove dated 10/30/96) ("I am grateful for USIS offer to continue storing my art with you when you move to your new location the first of next year....

---

**10.** In her pretrial memorandum and at trial, plaintiff's counsel characterized the dinner as a "meeting." *See* Pl.'s Mem. at 8 ("On October 8, 1990 ... Ms. Leonardo and Mr. Van Kerkhove attended a meeting at the home of the USIS's Cultural Affairs Officer, Mary Ann Ignatius."); Tr. at 115:13, 133:10, 14, 24, 144:6; 258:2, 6 (statements by plaintiff's counsel). The court notes that while plaintiff referred to other encounters with ACC personnel as "meetings," *see id.* at 141:13, 146:7, 149:14, 155:25, 156:5, 174:16, plaintiff herself did not refer to the October 18, 1990 dinner with Ms. Ignatius as a "meeting." During cross-examination, defendant's counsel asked plaintiff whether "meeting" was "a word [plaintiff's] counsel provided to [her]" to describe the dinner with Ms. Ignatius. *Id.* at 228:8–14. Plaintiff replied: "Well, you don't notice I don't say [']meeting['] in almost anywhere in these pages ... [W]hen I wrote these books, I never thought anybody would ever see them." *Id.* at 228:11–12, 15–16.

Although I still very much want to continue showing and working in Belgium, as we had planned and done before, I have decided to have you ship it all home to me."); PX 94 (Letter from plaintiff to Jan Van Kerkhove dated 11/19/96) ("I refer to my letter ... in response to your kind offer to either take all my art work and supplies onto your new location ... or to ship it all home to me.").

Plaintiff's attorney emphasizes that "[t]here is no correspondence from the United States disclaiming any obligation to Ms. Leonardo." Tr. at 309:11–12. The court notes, however, that plaintiff did not offer into evidence any of the "multiple letters" between plaintiff and defendant that purportedly confirmed the detailed agreement that plaintiff claims to have worked out with Mr. Van Kerkhove and as to which she obtained the approval of Ms. Ignatius. *See* Pl.'s Mem. at 6. In fact, plaintiff offered into evidence only one letter authored by defendant. In this later, dated August 3, 1989, Mr. Van Kerkhove notified plaintiff that he had "scheduled an exhibition of [her] work for the period between mid-January to mid-February, 1990." PX 114. Mr. Van Kerkhove's letter begins, "I don't have time right now to address all the questions in your letters." *Id.* Although plaintiff testified that she "make[s] copies of all [her] letters, even thank you notes and cards," before placing them in the mail, Tr. at 94:6–8; *see also id.* at 224:9–10 (testimony by plaintiff that she "save[s] every letter [she] write[s]"), plaintiff did not offer copies of her letters referred to in PX 114. Further, although plaintiff's trial memorandum alluded to "at least one letter" from plaintiff to Ms. Ignatius discussing the government's ongoing performance of the alleged contract, *see* Pl.'s Mem. at 8, no such letter was offered into evidence at trial. The court finds plaintiff's documentary evidence even less probative of ratification than her trial testimony.

The trial proceedings provided neither more detail nor more documentary evidence than were produced during prior proceedings. Nor did the trial proceedings produce an entirely credible witness. Because plaintiff's testimony and documentary evidence, taken as a whole, fail to demonstrate that Ms. Ignatius knew the details of plaintiff's alleged agreement with Mr. Van Kerkhove, *Beebe,* 180 U.S. at 354, 21 S.Ct. 371, or that Ms. Ignatius knowingly approved the terms of that agreement, *Harbert/Lummus,* 142 F.3d at 1434, plaintiff has not sustained her burden of proving that Ms. Ignatius ratified the alleged agreement. Therefore, the court finds that no bailment contract was formed between Ms. Leonardo and the United States.

### D. Whether Defendant Caused the Loss of Plaintiff's Artwork

Although the court finds that a valid bailment contract never existed in this case, the court, in the interest of judicial economy and efficiency, turns to the question of whether defendant would have been liable for causing the loss of plaintiff's stored artwork if a valid bailment contract had been formed between the parties.

### 1. The Parties' Respective Burdens of Proof

"A bailment relationship is said to arise where an owner [ (the bailor) ], while retaining title, delivers personalty to another [ (the bailee) ] for some particular purpose upon an express or implied contract. The relationship includes a return of the goods to the [bailor] or a subsequent disposition in accordance with [the bailor's] instructions." *Lionberger v. United States,* 178 Ct.Cl. 151, 371 F.2d 831, 840 (1967). Under the common law of bailment,[11] "the bailee of goods who has

---

11. "It is customary, where Congress has not adopted a different standard, to apply to the construction of ... contracts [with the government] the principles of general contract law." *Priebe & Sons, Inc. v. United States,* 332 U.S. 407, 411, 68 S.Ct. 123, 92 L.Ed. 32 (1947); *Fomby–Denson v. Dept. of Army,* 247 F.3d 1366, 1373–74 (Fed.Cir.2001) (quoting same); *see also Reading Steel Casting Co. v. United States,* 268 U.S. 186,

188, 45 S.Ct. 469, 69 L.Ed. 907 (1925) ("The [government] contract is to be construed and the rights of the parties are to be determined by the application of the same principles [of contract law] as if the contract were between individuals."). Accordingly, the court notes, and the parties agree, that if a valid contract had been formed in this case, the principles of bailment between private parties, "as developed in the

not assumed a common carrier's obligation" assumes a duty "to exercise due care in the protection of the goods committed to his care." *Commercial Molasses Corp. v. N.Y. Tank Barge Corp.,* 314 U.S. 104, 110, 62 S.Ct. 156, 86 L.Ed. 89 (1941). When a bailee in "exclusive physical possession of [bailed] goods" fails to return those goods to the bailor, the bailee "is presumed to be negligent if he cannot explain the loss or disappearance of the goods, and the burden is on the bailee to show that it exercised the degree of care required by the nature of the bailment." *Brink's Inc. v. Happy Hocker, Inc.* 136 B.R. 883, 886 (S.D.Fla.1992) (applying Florida law); *see also Indemnity Ins. Co. of N. Am. v. Hanjin Shipping Co.,* 348 F.3d 628, 637–38 (7th Cir.2003) (applying Illinois law).

The parties disagree as to the nature of the bailment alleged in plaintiff's complaint and, consequently, the measure of defendant's duty of care. According to defendant, any bailment was " 'gratuitous,' an accommodation extended to Ms. Leonardo," Def.'s Mem. at 6; *see also* Tr. at 305:11–13, that obligated defendant only to use slight care, and rendered it liable only for gross negligence, *Rodi Yachts, Inc. v. Nat'l Marine, Inc.,* 984 F.2d 880, 885 (7th Cir.1993) (noting that a "gratuitous (that is, unpaid) bailee … does not owe his bailor a duty of ordinary care, but only one of slight care."). Plaintiff's complaint contains, in each of its eighty-eight counts, the allegation that defendant's conduct was "grossly negligent," *e.g.,* Compl. ¶¶ 1, 43, 64, 576, 632, 736, which certainly suggests plaintiff's belief that the alleged bailment was gratuitous. However, plaintiff argues that the bailment was in fact for the "mutual benefit of both parties," Pl.'s Mem. at 16, and that defendant, who was "required to exercise due care," *id.* at 30, was liable for ordinary negligence. *See also Rodi Yachts,* 984 F.2d at 885 ("[At] common law, a bailee is responsible for exercising due care in the keeping of the good that has been entrusted to him."). Because the court finds the evidence at trial sufficient to rebut a presumption of either gross or ordinary negligence on

the part of defendant, the court assumes without deciding that a bailment for mutual benefit exists in this case.

Where the bailment is one for mutual benefit, a bailee can rebut an initial presumption of ordinary negligence with (1) evidence of the bailee's use of ordinary care; or (2) "evidence of some other cause of loss or injury." *Buchanan v. Byrd,* 519 S.W.2d 841, 844 (Tex. 1975) (quotation and citations omitted) (applying Texas law); *see also Sunfresh, Inc. v. Bean Acres, Inc.,* 180 F.Supp.2d 1224, 1229 (D.Kan.2001) (applying Kansas law); *Dole Fresh Fruit Co. v. Del. Cold Storage, Inc.,* 961 F.Supp. 676, 680–81 (D.Del.1997) (applying Pennsylvania law); *Coster v. Piekarski,* 3 P.3d 333, 334 (Alaska 2000) (applying Alaska law); *Bachman Chocolate Mfg. Co. v. Lehigh Warehouse & Transp. Co.,* 1 N.J. 239, 62 A.2d 806, 807 (1949) (applying New Jersey law). "Since the bailee in general is in a better position than the bailor to know the cause of the loss and to show that it was one not involving the bailee's liability, the law lays on [the bailee] the duty to come forward with the information available to him." *Commercial Molasses,* 314 U.S. at 111, 62 S.Ct. 156. A bailee carries its burden of production by presenting "sufficient evidence to support a finding that the presumed fact did not exist and that the defendant was free from fault." *Indemnity Ins.,* 348 F.3d at 637–38 (internal quotations and citation omitted); *United Farm Family Ins. Co. v. Riverside Auto Sales,* 753 N.E.2d 681, 685 (Ind. App.2001) ("[A] bailee can rebut the inference of negligence by presenting evidence tending to prove the loss, damage, or theft was occasioned without his fault or neglect.") (applying Indiana law).

Although the initial burden of going forward shifts to the bailee, the bailee must only "com[e] forward with evidence tending to show due care." *Singer Co. v. Stott & Davis Motor Exp.,* 79 A.D.2d 227, 436 N.Y.S.2d 508, 511 (App.Div.1981) (applying New York law). The burden of proof remains with the plaintiff:

common law and explained by precedent," would apply to that contract. *Montana v. United States,* 124 F.3d 1269, 1273 (Fed.Cir.1997); *JGB*

*Enters.,* 63 Fed.Cl. 319, 330–31 (2004); *see* Pl.'s Mem. at 30–31; Def.'s Mem. at 6–8.

The burden of proving negligence never shifts from the plaintiff. He must prove the delivery, the bailment and the failure to return; thereupon it is incumbent upon the bailee to explain the failure. If he does so, the bailor must prove that the bailee failed to use ordinary care and diligence to safeguard such property and that his failure to perform that duty caused the loss.

*J. Aron & Co. v. Serv. Transp. Co.*, 486 F.Supp. 1070, 1074 (D.Md.1980) (applying Maryland law); *see also United Family Farm Ins.*, 753 N.E.2d at 685 ("The purpose of the shifting burden of production is merely to relieve the plaintiff of the practical burden of proving what happened to his property while out of his possession. It in no way relieves the bailor of his ultimate burden of proving fault on the part of the bailee.") (citation omitted). Accordingly, "after the bailee has offered proof of the circumstances of the loss, or has come forward with some evidence of some intervening cause, such as theft, which is sufficient to excuse non-delivery ... the plaintiff [must] go forward with affirmative evidence [proving] the defendant-bailee's negligence." *Inter–Ocean (Free Zone), Inc. v. Manaure Lines, Inc.*, 615 F.Supp. 710, 716 (S.D.Fla.1985) (applying Florida law); *cf. Hansen v. Or.—Wash. R.R. & Navigation Co.*, 97 Or. 190, 191 P. 655, 656 (1920) ("[I]n some jurisdictions the defendant is required to acquit himself of negligence by a preponderance of the evidence; but ... we cannot give approval to that doctrine. The plaintiffs must show ... that the defendant was negligent as charged in the complaint; and it cannot be said that they have shown this alleged ultimate fact, unless the evidence preponderates in their favor.... [I]f the evidence for the defendant in weight equals the evidence for the plaintiffs, then the evidence for the plaintiffs is overcome.") (applying Oregon law).

In his pretrial memorandum, plaintiff's attorney suggests that defendant must shoulder a heavier burden: "[T]he bailee's burden of proof of due care is a significant one. It must prove in detail the circumstances of how the property was lost *and* that these circumstances were not the result of its own negligence." Pl.'s Mem. at 31 (citing *Griffin v. Nationwide Moving & Storage Co.*, 187

Conn. 405, 446 A.2d 799, 801–02 (1982) and *Knowles v. Gilchrist Co.*, 362 Mass. 642, 289 N.E.2d 879, 884 (1972)). Plaintiff's reliance on *Griffin* and *Knowles* is misplaced. As noted above, and as argued by the parties, if a contract had been formed in this case, that contract would have been, at most, a bailment for mutual benefit. *See supra;* Pl.'s Mem. at 16; Def.'s Mem. at 6, 8. *Griffin* and *Knowles*, by contrast, involved bailments for hire. *Griffin*, 446 A.2d at 805 ("[T]he defendant [was] a professional bailee for hire."); *Knowles*, 289 N.E.2d at 884 ("[O]ur decision in this case creates only a specific rule for a specific class of cases, bailment for hire."). In a bailment for hire, "the bailee is compensated, as when one leaves a car with a parking attendant." *Black's Law Dictionary* 152 (8th ed.2004); *see also Griffin*, 446 A.2d at 805 ("[B]ailees [such as the one in this case], who have been termed 'professional' bailees, as differentiated from 'ordinary' bailees, are those who make it their principal business to act as bailees and who deal with the public largely 'on a uniform and not an individual basis.' " (citations omitted)).

Many jurisdictions, including, most importantly, this one, apply the same negligence analysis to cases involving bailments for mutual benefit and cases involving bailments for hire. *See, e.g., Gulf Transit Co. v. United States*, 43 Ct.Cl. 183, 198, 1907 WL 839 (1908) (finding contracts between the government and "common carriers, warehousemen ... storage companies, and all other corporations or individuals engaged in the business of receiving and caring for the property of others either for the purpose of hire or for the performance of work thereon ... in the class of mutual benefit bailments requiring ordinary diligence of the bailee."); *Gray v. Snow King Resort, Inc.*, 889 F.Supp. 1473, 1478 (D.Wyo.1995) (stating that the same standard applies to a bailment for hire as to a bailment for mutual benefit) (applying Wyoming law). Other jurisdictions, such as those cited by plaintiff, distinguish the two types of bailment and impose a heavier burden of proof on bailees for hire than on bailees for mutual benefit. *E.g., Delaney v. Towmotor Corp.*, 339 F.2d 4, 7 (2d Cir.1964) (noting that the phrase " 'bailor-bailee rela-

573

tionship for mutual benefit,' [is] a broader phase than 'bailment for hire.' ") (citations omitted) (applying New York law); *Knowles,* 289 N.E.2d at 885 ("[W]e hold that once the bailor [for hire] proves delivery of the property to the bailee in good condition and the failure to redeliver upon timely demand, the burden of proof is irrevocably fixed upon the bailee to prove by a fair preponderance of the evidence that he has exercised due care to prevent the property's loss or destruction. Our holding extends to all bailment for hire cases[.]"). However, the court has not located any authority—nor has plaintiff cited any—for the proposition that a bailment for mutual benefit casts on a bailee the heightened burden of proving both the circumstances of the loss and "that he has exercised due care," *Knowles,* 289 N.E.2d at 885, that the bailment for hire cases of *Griffin* and *Knowles* required. The cases cited by plaintiff are inapposite where, as here, the alleged bailment is one for mutual benefit.

2. Whether the Parties Carried Their Respective Burdens

Here, the parties do not dispute that plaintiff delivered her artwork to defendant in 1990, and that defendant did not return the artwork to plaintiff. *See* Pl.'s Mem. at 30; Def.'s Mem. at 5–6. Accordingly, the court turns to whether defendant's negligence caused the loss of plaintiff's art.

In prior proceedings, it was assumed by the parties that plaintiff's artwork was destroyed during renovations to the leased facility housing the ACC, *see, e.g.,* Compl. ¶ 41 ("Upon information and belief, at or around the end of December 1996, each of Leonardo's 87 original works of art was destroyed during renovations to the original building housing the [ACC] in Belgium."), and that the destruction was caused by a bulldozer operated under the authority of "S.A. Bastion," the owner of the building in which the ACC was a tenant, *Leonardo I,* 55 Fed.Cl. at 346 ("In 1996, the owner of the building in which the [ACC] was located began renovations of the entire building. At the beginning of December, 1996, the side entrance of the building and an adjacent storage room were demolished by a bulldozer. Plaintiff's

artwork, which was stored in that storage room, was destroyed.") (citing filings by both parties); *see also Leonardo II,* 60 Fed.Cl. at 127 ("In December 1996, the majority of plaintiff's artwork that was stored at the [ACC] was destroyed when the room in which her art was stored was bulldozed."); Def.'s Mem. at 9 ("The loss of the art was the fault of one or more third parties—the bulldozer operator, the remodeling contractor, the building owner, or some combination of the above."); *see generally* PX 67 (Lease agreement between S.A. Parkings Albertine and Botanique and the Secretary of State of the United States for the ACC facility) (containing handwritten notations throughout, which identify the "Lessor" as "Bastion" and the "Lessee" as "U.S."). In prior proceedings it also was assumed by the parties that defendant was surprised to discover the demolition of plaintiff's artwork. *See* Pl.'s Mem. at 14 (" '[Mr. Van Kerkhove] said, on the first of December, I went down to the storage room to start packing your art and returning it to you, and at the moment the elevator door opened, there was a bulldozer in there destroying the storage room.' " (quoting plaintiff's written declaration)).

Plaintiff's documentary trial evidence and much of her testimony were consistent with the assumptions on which prior proceedings were conducted. At trial, plaintiff presented extensive testimony concerning the destruction of her artwork. Her trial testimony on the subject begins with an August 23, 1996 telephone call from plaintiff to Mr. Van Kerkhove. Tr. at 162:4–5 (statement of plaintiff); *see also* PX 97, at 2 (plaintiff's telephone bill, reflecting a 32–minute call to Belgium on this date). During this call, according to plaintiff's testimony, Mr. Van Kerkhove informed plaintiff that the ACC would "be [relocating its offices] in the spring time, probably late spring time 1997." Tr. at 163:2–3 (statement of plaintiff); *see also id.* at 176:13–20 (statement of plaintiff that Mr. Van Kerkhove "said that the building had been bought by new owners and that they were renovating the building. Evidently they had been offered new space in the building, but they decided it would be more desirable for them to move to a nearby location, that they liked it better and they wanted to

move"). Plaintiff's attorney asked whether they "discuss[ed] the continued storage of [her] artwork." *Id.* at 163:4–5. "Yes," plaintiff replied. *Id.* at 163:6. When her attorney asked, "What were the nature of those discussions," *id.* at 163:7, plaintiff replied:

> The nature of the discussions was that he asked me, he said—you know, my mind was kind of swirling, what am I going to do now, what should I do. He then began to make some offers, and he said would you like us to take your artwork along with us to the new location and continue looking for shows, or would you prefer to have us return it to you.

*Id.* at 163:8–14.

"[A]fter a long hard time of thinking," plaintiff ultimately decided that "it was time [for the ACC] to go ahead and return [her] art." *Id.* at 167:19–22 (testimony of plaintiff). Plaintiff introduced into evidence a copy of a letter she wrote to Mr. Van Kerkhove dated October 30, 1996, which purported to follow up on the August 23, 1996 telephone call:

> Since we spoke on the phone a few weeks ago, I have thought long and hard. I am grateful for USIS['] offer to continue storing my art with you when you move to your new location the first of next year or to ship [it] all home to me.... Although I still very much want to continue showing and working in Belgium, as we had planned and done before, I have decided to have you ship it all home to me which I believe will be safest.

PX 93 (Letter from plaintiff to Jan Van Kerkhove dated 10/30/96). According to plaintiff, Mr. Van Kerkhove did not answer this letter. Tr. at 170:20–22 (colloquy between plaintiff and her counsel). Plaintiff also introduced a copy of a second letter to Mr. Van Kerkhove dated November 19, 1996:

> Again I refer to my letter to you [from] the end of Oct[ober] in response to your kind offer to either take all my art work and supplies on to your new location for [USIS] when you move next year or to ship it all home to me. As I requested, please ship it all home to me and thank you very much.

PX 94 (Letter from plaintiff to Jan Van Kerkhove dated 11/19/96). According to plaintiff, Mr. Van Kerkhove did not reply to this letter. Tr. at 177:17–20 (colloquy between plaintiff and her counsel).

Plaintiff testified that she again telephoned Mr. Van Kerkhove on March 26, 1997, when she "realized that their moving date was coming up rapidly, and [her] art hadn't been returned." *Id.* at 177:25–178:2; PX 97 (plaintiff's telephone bill) at 2 (reflecting 3/26/97 phone call to Belgium). According to plaintiff,

> I said Jan, I said where are my paintings, I've been waiting for them to come, they should have been here by now.
>
> . . . .
>
> [His response was] [s]ilence. There was this long pause. I sat there, and I heard him light up a cigarette. He took a long, long drag, and he says I'm afraid I have bad news for you. Again a long pause, and I thought, well, one of my paintings must have got hurt. He said I went down in December to start packing up your paintings as you requested and send them home to you, and at the moment the elevator door opened, there was a bulldozer in the storage room that had completely demolished it. All of your paintings had been thrown in the bottom of a dumpster and all this rubble on top of it and nothing could be saved.

Tr. at 179:11–180:1 (testimony of plaintiff). Ms. Leonardo stated that Mr. Van Kerkhove did not explain why her art had been moved into the basement. *See id.* at 181:23–25 (colloquy between plaintiff and her counsel).

Plaintiff introduced into evidence a copy of a letter she began writing to Mr. Van Kerkhove immediately following their March 26, 1997 telephone conversation. PX 95 (Letter from plaintiff to Jan Van Kerkhove dated 4/4/97); Tr. at 187:11–16 (testimony of plaintiff explaining why the letter is dated April 4, 1997, rather than March 26, 1997: "I went to the computer and started the letter and just got as far as the first paragraph, and then ... stopped. Then I came back later, when I could get my head together ... so then I finished it and dated it [on April 4, 1997].").  Plaintiff's letter began:

We have just spoken on the phone and I am still in a state of shock. What you have told me has happened in the building at Square du Bastion, is beyond belief, except in your worst nightmare. How could anyone come into space legally leased by an organization and wantonly destroy their property, including ruthlessly smashing valuable art with a bulldozer? It appears that this act of vandalism was performed without previous warning or the common courtesy to give you any alternative options. I can imagine your horror when you got off the elevator and witnessed this thoughtless destruction.

PX 95 (Letter from plaintiff to Jan Van Kerkhove dated 4/4/97).

Plaintiff enclosed with this letter "price lists of the inventory for the exhibition I had with the Cultural Center," *id.; see also* PX 5 (list of forty-two works exhibited at the ACC, including titles and prices), and a price list for forty-four other works by plaintiff that were created during her 1990 visit to Brussels and stored at the ACC, PX 95; *see also* PX 14 (Document titled "Works of Art Destroyed at U.S. Embassy in Brussels, Belgium," which includes the titles and prices of eighty-six[12] artworks stored by plaintiff at the ACC). During cross-examination, defendant's counsel asked plaintiff why she provided these price lists to Mr. Van Kerkhove. Tr. at 242:1–2. Plaintiff replied that she included the lists for "inventory [purposes], so he would know what had been lost." *Id.* at 242:3–4. When questioned by defendant's counsel whether she was "requesting the United States government [to] make a payment to [her] in this letter," *id.* at 242:7–8, plaintiff stated that she was not, *id.* at 242:9.

Plaintiff's letter concluded: "Thank you for sending the letters. My attorneys will be contacting the counsel of Bastion S.A." PX 95 (Letter from plaintiff to Jan Van Kerkhove dated 4/4/97). "S.A. Bastion" is the owner of the building in which the ACC facilities were located. *See generally* PX 67 (Lease agreement between S.A. Parkings Albertine and Botanique and the Secretary of State of the United States for the ACC facility) (containing handwritten notations throughout, which identify the "Lessor" as "Bastion" and the "Lessee" as "U.S.").

While plaintiff's documentary evidence and some of her testimony demonstrates plaintiff's belief that a third party caused the destruction of her artwork, plaintiff's counsel also elicited testimony which distanced Ms. Leonardo from that belief. For example, after plaintiff described her telephone conversation with Mr. Van Kerkhove, plaintiff's counsel asked plaintiff whether she had "any personal knowledge of whether [her] art was, in fact, destroyed by a bulldozer." Tr. at 180:12–14. Plaintiff replied, "None whatsoever." *Id.* at 180:15. When questioned by her attorney whether plaintiff "ever receive[d] any tangible proof of what happened to that artwork from the United States," *id.* at 183:3–4, plaintiff replied, "No, and I fully expected that they at least would have retrieved something to have visible evidence and if nothing less than that, at least photograph it," *id.* at 183:5–8. At trial, plaintiff's attorney also suggested that defendant, rather than a third party, caused the loss of plaintiff's artwork:

> From the filing of her complaint ... through her proposed findings of fact and her statement of genuine issues ... Ms. Leonardo has consistently maintained the same position. She admits that Jan Van Kerkhove told her that the art was destroyed by a bulldozer, but he has no personal knowledge of whether that's true, and the United States has never sent any tangible proof that that claim is accurate. That is not a concession that Ms. Leonardo believed that statement to be true.

*Id.* at 21:11–22 (opening statement of plaintiff's counsel). Plaintiff's attorney also argued that this position is consistent with the court's previously published orders:

> At most, the Court's prior [o]rder[s] [are] sufficient to show that the artwork was destroyed and that a bulldozer was the mechanism through which that destruction occurred. Even if we assume that the

---

12. Plaintiff testified at trial that this list was not complete and omitted at least one piece of plaintiff's artwork. *See* Tr. at 123:13–14. Her com-

plaint seeks damages for breach of contract and the destruction of eighty-seven items. Compl. ¶¶ 52–58.

bulldozer had something to do with the renovations going on in the building, that is not sufficient to overcome the presumption of [defendant's] negligence. It may be enough to show the what of the destruction, but it is not enough to show the why and the how.

*Id.* at 24:1–9 (opening statement of plaintiff's counsel).

Regardless of whether plaintiff's position is consistent with the court's prior orders, the court notes that plaintiff's argument that defendant, rather than an intervening third party, caused the loss of plaintiff's artwork is inconsistent with the letter she wrote to Jan Van Kerkhove following the destruction of her artwork and offered into evidence at trial. *See* PX 95 (Letter from plaintiff to Jan Van Kerkhove dated 4/4/97). The last line of this letter states: "Thank you for sending the letters. My attorneys will be contacting the counsel of Bastion S.A." *Id.*

During cross-examination, defendant's counsel asked plaintiff about the "letters" mentioned in PX 95. Plaintiff replied that she was referring to "[l]etters that ... Mr. Van Kerkhove's office had sent to people that they considered to be involved in the whole situation. I don't know who they were." Tr. at 243:5–8. Plaintiff claimed that she asked her attorneys to "contact[ ] the counsel of Bastion S.A.," PX 95, "[b]ecause the letters [Mr. Van Kerkhove] had sent to [her] were concerning Bastion," Tr. at 243:24–25; *see also id.* at 245:2–4 ("All the letters they had sent to me was themselves contacting Bastion. And I wanted to protect my interests."). However, plaintiff insisted during cross-examination that, although she planned to have her attorneys contact the attorneys of S.A. Bastion, she did not know who or what "Bastion S.A." or "S.A. Bastion" referred to:

> Q: You didn't know who Bastion was at the time?
>
> A: No.

Tr. at 246:8–9; *see also id.* at 243:7–8 ("I don't know who [S.A. Bastion] were."); *id.* at 246:4 ("I don't know who they were."); *id.* at 246:12–13 ("I didn't know who it was, if it was part of the United States government, because the name on your address was Bas-

tion. I had no idea."); *id.* at 268:3–4 (testimony of plaintiff that S.A. Bastion was mentioned in "the letters that they sent to me, but I didn't know who they were"). On redirect examination, plaintiff's attorney asked whether plaintiff presently had "any personal knowledge of what Bastion S.A. is." *Id.* at 262:20–21. Plaintiff replied, "[n]o, I do not." *Id.* at 262:22.

During re-cross-examination, plaintiff appeared to imply that she referred to S.A. Bastion only in "that letter" to Jan Van Kerkhove. *Id.* at 268:7–9 ("I [referred to S.A. Bastion] in that letter, because [Mr. Van Kerkhove] had sent [other letters referencing S.A. Bastion] ... and that's how I knew about [S.A. Bastion]."). When defendant asked plaintiff whether she "recall[ed] using the name S.A. Bastion in further correspondence with the government," *id.* at 268:22–23, plaintiff was emphatic that she only used the term in her April 4, 1997 letter, *see* PX 95, and that she did not know who or what S.A. Bastion was:

> I received the letters that I mentioned in [PX 95] that S.A. Bastion, whoever they are, I haven't a clue. I have no idea who they are. All I know is that there was some correspondence, and they thought it was important to send them to me so I would know that they were dealing with them and just so that they knew that I received the letters and was aware of that. I have no idea who they are. I have no idea whatsoever. I never heard of them before in my life before those letters came.

Tr. at 268:24–269:8.

To refresh plaintiff's recollection concerning her discussion of S.A. Bastion in further correspondence with defendant, defendant's counsel drew plaintiff's attention to a second letter, subsequently written by plaintiff, in which she referred to S.A. Bastion. *See generally id.* at 269:9–272:5 (colloquy between defendant's counsel and plaintiff); PX 38 (Letter from plaintiff to USIS Cultural Attaché Harriet Elam, dated 9/4/97) (marked for identification purposes only). Defendant's counsel asked if this second letter "refresh[ed] [plaintiff's] recollection ... as to whether [she] used the term S.A. Bastion."

Tr. at 271:7–8 (statement of defendant's counsel), and plaintiff agreed, *id.* at 271:9 (statement of plaintiff that "I used that term, yes."). Defendant's counsel then asked plaintiff whether she "[was] referring to [S.A. Bastion] in the context of a third party" in that letter. *Id.* at 271:10–11. At this point, plaintiff became quite emotional:

> I had just lost years of work, and I was—it cost me a huge amount of money. I would no longer have this artwork to be able to commit to other shows in Europe when I had been working on things in France to be able to have it in—

*Id.* at 217:12–16. The court then prompted plaintiff to "try to answer the question." *Id.* at 271:17–18. Plaintiff continued:

> Okay. So I got this law firm … in Brussels to work. [Attorney Herb Kogels] asked me to ask [S.A. Bastion], but I still have no idea who they are. We had letters from their [e]mbassy. They said something about these people. I sent those letters to Mr. Kogels. We weren't getting any response at all. They never answered any of my letters. They never called me. It's very clear that Mr. Van Kerk[h]ove and everybody was told not to have a word with me. Nothing was happening. I was trying to get some help. The only thing I knew about was what they sent to me was SA Bastion, whoever they are.

*Id.* at 271:19–272:5.

Plaintiff's letter, PX 95 (letter from plaintiff to Jan Van Kerkhove, dated 4/4/1997), and plaintiff's testimony reveal that plaintiff retained "attorneys," *id.*, to redress the destruction of her artwork, and that she was at least contemplating, if not initiating, legal action against S.A. Bastion for its involvement in her loss. In light of this evidence, the court finds it highly improbable that plaintiff did not "have any personal knowledge of what Bastion SA is," Tr. at 262:20–22, at the time shortly after the loss and at the time of trial, as plaintiff testified. The court finds plaintiff's testimony on this point not credible.

Given the decision of the United States not to offer evidence, it would have been of assistance to plaintiff's case regarding causation that there be no testimony concerning the circumstances surrounding the loss of plaintiff's artwork, and especially that there be no testimony about the involvement of third persons. In his pretrial memorandum, plaintiff's attorney incorrectly argued that the presumption that defendant was negligent was not rebuttable because "[t]here is no admissible evidence that could demonstrate that the United States exercised due care." Pl.'s Mem. at 32; *see also* Tr. at 290:17–23. Here, however unusual, the evidence presented by plaintiff at trial was sufficient to rebut the presumption of defendant's negligence and establish that—as indicated by plaintiff's own words—an unpredictable intervening cause destroyed her artwork. PX 95 (Letter from plaintiff to Jan Van Kerkhove dated 4/4/97) ("How could anyone come into [a] space legally leased by an organization and wantonly destroy their property, including ruthlessly smashing valuable art with a bulldozer? It appears that this act of vandalism was performed without previous warning …. I can imagine your horror when you got off the elevator and witnessed this thoughtless destruction."). In light of plaintiff's letter identifying defendant's landlord in conjunction with legal action to redress the destruction of the artwork, and in light of plaintiff's obvious effort to conceal her knowledge of S.A. Bastion from the court, the court finds that sufficient evidence was presented at trial to support a finding that a third party, rather than defendant's negligence, caused plaintiff's loss. *Indemnity Ins.*, 348 F.3d at 637–38 ("[The] presumption of bailee negligence … may be rebutted if [there is] sufficient evidence to support a finding that the presumed fact did not exist and that the defendant was free from fault." (internal quotations and citation omitted)).

Accordingly, the burden returns to and remains with plaintiff to prove defendant's negligence. Although plaintiff's attorney argued at trial that "the United States was negligent when it moved Ms. Leonardo's artwork from a safe, secure, professional art storage room within the confines of the [ACC] to an unsecured junk room in the basement of the building," Tr. at 27:3–7, and implied that moving plaintiff's artwork constituted negligence causing the destruction of

plaintiff's artwork, Compl. ¶ 43(B) (alleging that defendant's conduct was "grossly negligent ... in ... moving the art to a new location ... not conducive to the safekeeping of original works of art."), plaintiff did not "go forward with [sufficient] affirmative evidence of the defendant-bailee's negligence" to carry her burden of proof. *Inter–Ocean,* 615 F.Supp. at 716.

Plaintiff testified that, during the March 16, 1997 telephone call concerning the destruction of her artwork, "[Mr. Van Kerkhove] said I went down in December to start packing up your paintings ... and at the moment the elevator door opened, there was a bulldozer in the storage room that had completely demolished it." Tr. at 179:20–24; *see also* Pl.'s Mem. at 14 (quoting a nearly identical description of the same conversation from plaintiff's declaration: "[Mr. Van Kerkhove] said, on the first of December, I went down to the storage room to start packing your art ... and at the moment the elevator door opened, there was a bulldozer in there destroying the storage room."). When prompted by her attorney to specify whether "Mr. Van Kerkhove [told her] where [her] art was at when it was destroyed," *id.* at 181:16–17 (question by plaintiff's counsel), plaintiff did not repeat her testimony that the art was in a "storage room," *id.* at 179:23, but instead replied, "[h]e told me it was in the basement," *id.* at 181:18.

Plaintiff's attorney then asked whether plaintiff had "even see[n] a storage room on [the basement] level" of the building. *Id.* at 182:6–7. Plaintiff replied that "[a]t one time ... [Mr. Van Kerkhove] opened the door and put something in there, and I was able to look through the door as we were on our way to the car," *id.* at 182:8–10, and that the room she saw was "dirty and piled with junk.... Everything was just sort of thrown in there," *id.* at 182:12, 18–19. *See also id.* at 247:11–14 (testimony of plaintiff during cross-examination that "[a]t one point we'd gone down-

stairs to go to the garage, [and Mr. Van Kerkhove] had to put something in it, he opened the door, and I saw the room."). During cross-examination, plaintiff stated that she did not enter the room, but "just stood at the door [because] [i]t was a small room." *Id.* at 248:12–13. Plaintiff appears to assume that her art was moved into this room. *Id.* at 181:21–22 (statement of plaintiff that she "was amazed that they would have put [her art] in that room").

The court finds plaintiff's testimony insufficient to prove by a preponderance of evidence that defendant's negligence caused the loss of her artwork. As a threshold matter, plaintiff's unaided testimony indicates only that her art was moved from one storage room to another.[13] Only when prompted by her attorney did plaintiff suggest that her art had been moved into a room in the basement. Assuming that plaintiff's art was moved to a basement storage room, plaintiff's testimony supports only the fact that, on one occasion, she viewed a small storage room in the basement of the building housing the ACC. Plaintiff offered no evidence placing her art in that room at the time the art was destroyed.

Further, plaintiff offered no evidence that storing her art in a storage room at the ACC would have made it vulnerable to destruction by a bulldozer. *Cf. Gulf Transit Co.,* 43 Ct.Cl. at 199 ("[T]he Government will assume no responsibility ... for the acts of third persons, or for any disaster occurring to the ... vessel [containing bailed goods] while in dock."). Plaintiff's evidence indicates only that the demolition by a bulldozer of a room that contained property of the ACC was not anticipated by either party. *See* PX 95 (Letter from Plaintiff to Jan Van Kerkhove dated 4/4/97) ("How could anyone come into [a] space legally leased by an organization and wantonly destroy their property, including ruthlessly smashing valuable art with a bulldozer? It appears that this act of vandalism was performed without previous warning

---

13. Ms. Leonardo testified that her bailment contract with Ms. Ignatius called for her property to be stored in a room "adjacent to the gallery that's built specifically to contain art," Tr. at 110:4–5, which plaintiff found to be "an excellent storage room," *id.* at 116:7–8. Plaintiff explained that the aspect of the room that was

"built specifically" referred to racks on which art could be placed. *See id.* at 110:5–18; *id.* at 110:8–10 ("[The art] needs to be separated and divided in order to protect it, so we put them into things that are called racks.") (testimony of plaintiff).

.... I can imagine your horror when you got off the elevator and witnessed this thoughtless destruction."); Tr. at 179:20–180:1 (testimony of plaintiff describing Jan Van Kerkhove's account of the destruction). The court finds that it could not have been anticipated by defendant that relocating plaintiff's artwork to a room used for storage by the ACC would have put that artwork in the path of a bulldozer, and concludes that plaintiff failed to establish defendant's negligence by a preponderance of the evidence.

Even if a valid bailment contract had been formed in this case, plaintiff's own documentary evidence and testimony during direct and cross-examination was sufficient to rebut an initial presumption of defendant's negligence. Plaintiff did not then carry her burden of proving negligence by defendant that resulted in the destruction of plaintiff's artwork. Accordingly, the court concludes that, even if a valid bailment contract had been formed between the parties in this case, defendant is not liable for causing the loss of plaintiff's artwork.

III. Conclusion

Based on the evidence presented at trial, and for the foregoing reasons, the court concludes that Jan Van Kerkehove did not possess implied authority to enter into contracts on behalf of the United States without the approval of his supervisor, Mary Ann Ignatius. The court also concludes that plaintiff failed to sustain her burden of proving that her alleged bailment contract was ratified by Ms. Ignatius or any other individual with contracting authority. Because there was no "meeting of the minds" between plaintiff and a person with authority to bind the government on the terms of plaintiff's alleged a bailment contract, the court concludes that no such contract was ever formed. The court also finds that, even if a valid bailment contract had been formed between the parties, plaintiff failed to establish that defendant was legally responsible for causing the loss of her artwork.

Accordingly, the court directs the Clerk of the Court to enter judgment in favor of defendant as to all claims of Elaine Leonardo and to dismiss the Complaint. No costs.

IT IS SO ORDERED.